## BARRY *vs.* GAMBLE.

*Ejectment.* — By virtue of the act of Congress of 17th February, 1815, entitled, "An act for the relief of the Inhabitants of the late county of New Madrid, in the Missouri Territory, who suffered by earthquakes," the recorder of land titles issued a certificate on the 30th November following, to B. L., (under whom plaintiff claimed,) or his legal representatives, authorizing him to locate 640 acres of land.

On the 7th July, 1817, T. H., by virtue of this certificate, located the land in controversy. The survey of this location was made in April, 1818. On the 13th June, 1827, a patent issued for this land to B. L., or his legal representatives.

The title of the defendant was founded on a confirmation made by the Supreme Court of the United States in 1830, to the representatives of James Mackay, the claim in question being included within the boundaries of said confirmation. (Mackay *vs.* The United States, 10 Peters, 340.) A patent for the land confirmed, including the land in controversy, issued to the legal representatives of said Mackay, dated 31st March, 1841. From the record of this suit, it appeared, that the action was instituted on the 25th May, 1829, under the act of Congress of 26th May, 1824, and the acts supplementary thereto, for the purpose of "enabling the claimants to lands within the limits of the State of Missouri, &c., to institute proceedings to try the validity of their claims." *Held:*

1. That, although a confirmation under said act of Congress of 26th May, 1824, vests in the confirmee all the proprietary interest of the United States in the land, and is in terms and in effect an acknowledgment that the title of the claimant was valid under the laws and usages of the former government, and protected by the treaty of cession, yet it does not follow that these confirmations recognise such claims as perfect and complete titles, or that they give to the claim of the confirmee, as against other claimants, any more validity than it would have had under the former government.

2. That the effect of a confirmation under the acts of Congress of 26th May, 1824, and 24th May, 1828, is only a relinquishment of title on the part of the United States, and does not affect the right or title of adverse claimants of the same land. Therefore, the confirmation and patent to the representatives of said Mackay amounted merely to a relinquishment of the title of the United States to the land in controversy.

3. That the land in controversy having been disposed of by the United States, within the meaning of the 11th section of said act of May 26, 1824, the defendant's confirmation in 1830 could not prevail over the plaintiff's patent issued in 1827.

4. That, without undertaking to decide whether a New Madrid certificate, issued under the said act of 17th February, 1815, could be located on unsurveyed lands of the United States, yet, when a patent has issued, the courts will presume that the steps preliminary to a valid disposition of the land have been taken, unless it can be made to appear, that when the location was made the land was expressly reserved from sale.

### ERROR to Lincoln Circuit Court.

LAWLESS *and* CAMPBELL, *for Plaintiffs in Error.*

1. The decree of confirmation, and the patent issued thereon, in favor of the legal representatives of James Mackay, form a good title for the land in controversy, as against the United States, and one which will be indisputable, if the claim of the representatives of Lafleur be not valid. This position will not be denied. —10 Peters' Rep., 340, 100    3 Story's Laws 1841   1959; 4 Story's Laws, 2135, 2250.

2. The decree of the Supreme Court in favor of Mackay's representatives, is a confirmation in terms and in fact, *a confirmation strictly speaking*, and not a mere grant; and it recognizes the claim of Mackay as genuine and valid from the beginning, good according to the laws of Spain, the treaty of cession, and the laws of the United States. Of course, the claim and title take date from the date of the concession to him, and not merely from the date of the confirmation.

3. The location of the New Madrid claim of Lafleur, by Theodore Hunt, on the land in controversy, was illegal and void, because it was laid upon land which had never been surveyed, nor ordered to be sold by the president of the United States, and the sale of which, in fact, *was not authorized by law.*

4. The patent of Lafleur's representatives was illegal and void, because the original location thereof was unlawful, and it was issued for land which, at that time, did not belong to the United States.

5. The claim of Mackay has been distinctly recognized by the Supreme Court of the United States, as valid and genuine, and as such was protected by the law of nations, and the treaty of cession.

6. The limitations contained in the acts of 1824 and 1828, and other acts of Congress, do not bar any valid claim under the concession, the law of nations, or the treaty of cession, but merely such claims, or rights, as were furnished by, or arose under, the acts of Congress.

The limitations related to the remedy, and not to the right, and did not have the effect of annihilating the original title of the claimant.

7. The mere passage of an act of Congress, such as the act of 3d March, 1811, does not put land in the situation in which it can be said that *the sale thereof is authorized by law;* but it requires that the president and other ministerial officers should have acted under that law, so to make it lawful to sell the land, or to render the same *actually saleable.* The sale of the land is *unauthorized by law*, until it shall have been surveyed, the surveys approved, and the president shall have issued his proclamation under the law, and thereby authorized the sale of the land.

8. The act of Congress of 26th April, 1822, does not cure any defects in New Madrid locations, except those that arise from the want of conformity to the range, township, and sectional lines of the public surveys of the United States; and the necessity of making that exception, by the passage of that act, proves New Madrid locations, otherwise made, would have been considered irregular and void, without the aid of that law.

9. The Circuit Court erred in admitting testimony to invalidate or get behind the decree of the Supreme Court of the United States, viz., the depositions of Brown and Leduc, and the concession to Chouteau. The question of fraud attempted to be raised by that testimony was distinctly placed before the Supreme Court, and distinctly decided on by them. The question of fraud anterior to that decree, is decided by the decree; no fraudulent acts are alleged to have been resorted to, to obtain the decree.

Fraud, to be taken advantage of, must be taken advantage of at *the proper time,*

and before the proper tribunal, and when decided directly by such tribunal, the question cannot arise incidentally in the inferior courts.

10. The testimony is not sufficient to prove fraud, and the circumstances relied upon as fraudulent are amply explained by defendant.

GAMBLE *and* LEONARD, *for Defendant in Error.*

1. That the rejection by the court, of the notice filed in the surveyor's office, of Mackay's claim, was proper.— See Revised Code, 251.

2. That the depositions of Leduc and Browne were competent and legal testimony; and if they had not been, they had no effect whatever in the decision of the case.

3. That the concession and survey of Chouteau's claim, which was the northern boundary of the tract in dispute, was legal.

4. That the instruction given by the court below was a proper instruction, and was wholly independent of the evidence to which the defendant objected.

This point involves the following propositions:—

1st: That the defendant can have no benefit of an original Spanish grant, because he gave no such grant in evidence, and because, if he had given it in evidence, it was barred and nullified by the following acts of Congress:—act 2d March, 1805, sec. 4, 2 Story, 967; act 3d March, 1807, sec. 5, *Ibid.*, 1060; act 13th June, 1812, sec. 7, *Ibid.*, 1260; act 3d March, 1813, sec. 1; act 26th May, 1824, sec. 5 and 7, 3 Story, 1959.

These acts, in their operation upon such claims, are recognized by the Supreme Court of the United States as valid rules of decision.—Strother *vs.* Lucas, 12 Peters, 448.

2d: That the confirmation in favor of Mackay's representatives cannot avail the defendant against the title of the plaintiff, because the laws under which it is made expressly declares, that it shall have no effect as against that title, and the same is the law in relation to the patent upon that confirmation.—Act 24th May, 1828, sec. 2, 4 Storey, 2135.

3d: As neither the original grant, nor the confirmation, nor the Mackay patent, can avail the defendant against the Lafleur patent, he stands before the Court without title.

4th: That, if there had been an irregularity in the Lafluer title previous to the patent, the defendant cannot inquire into it.—3 Cond. Rep., 286, (9 Cranch, 87,) Polk *vs.* Wendall; 6 Cond. Rep., 350, (11 Wheaton, 380,) Patterson *vs.* Wynne; 1 Pet. Rep., 655, Ross *vs.* Barland; 13 Pet. Rep., 436, Boguel & Byrne *vs.* Brodrick; 6 Mo. Rep., Hunter *vs.* Hemphill; Jackson *vs.* Lawton, 10 John. Rep., 23; Stringer *vs.* Young's Lessee, 3 Pet. Rep., 340; Boardman *vs.* Lessees of Reed & Ford, 6 Pet. Rep., 380.

5th: There was no such irregularity as is pretended, for the record does not show when the location was made. What the location is, appears in Bagnall et al. *vs.* Broderick, 13 Peters, 448.

NAPTON, *Judge, delivered the opinion of the Court.*

This was an action of ejectment, brought by Gamble against Barry, to recover a tract of land in St. Louis county. By change of venue, the case was removed to Lincoln county, where it was tried, and a verdict and judgment obtained for Gamble.

From an agreement entered on the record, it appears, that the plaintiff (Gamble) has all the title which vested in the representatives of Baptiste Lafleur, by virtue of a New Madrid location and patent in 1827, and that Barry holds all the title that arises under a decree of confirmation made by the Supreme Court of the United States, to the representatives of James Mackay, in 1830, and that Barry was in possession of the premises at the time the action was instituted.

It appears, from testimony offered on both sides in the court below, that the titles of Lafleur and the representatives of Mackay were as follows:—

By virtue of the act of 17th February, 1815, the recorder of land titles issued a certificate on the 30th November, 1815, to Baptiste Lafleur, or his legal representatives, authorizing him to locate six hundred and forty acres of land.

On the 7th July, 1817, Theodore Hunt, by virtue of this certificate, located the land in controversy.

The survey of this location was made by Joseph C. Brown, in April, 1818.

On the 13th June, 1827, a patent issued to Lafluer, or his legal representatives.

It was also offered to be proved, on the part of the defendant, that on the 13th August, 1824, Luke E. Lawless, as agent for Mackay's representatives, filed a *caveat*, or protest, against Hunt's location, in the surveyor-general's office, but the testimony was excluded.

The title of the defendant was founded on a confirmation made by the Supreme Court of the United States, in 1830, to the representatives of James Mackay. It appears, by the record of the suit in which this confirmation was made, that an action was instituted by the widow and heirs of James Mackay, under the act of May 26th, 1824, and the acts supplementary thereto, by a petition filed in the District Court on the 25th May, 1829, to procure a confirmation of a concession made by lieutenant-governor Delassus on the 14th September, 1799. This concession is in the usual form, and ordered the surveyor to put Mackay in possession of the tract petitioned for. It is stated by the petitioners, that the claim had not been filed with the recorder of land titles, or board of commissioners, the said concession having been sent to New Orleans by said James Mackay, and not returned in time to enable him to file the same. The final decree of the Supreme Court of the United States was at the January term, 1830, and was as follows:—

"It is ordered, adjudged, and decreed, that the decree of the said District Court in this case be, and the same is hereby, reversed; and, proceeding to render such decree as the said District Court ought to have rendered, it is further ordered, adjudged, and decreed, that the title of the petitioners to the land described in this petition to the District Court is valid by the laws and treaty aforesaid, and the same is hereby confirmed as therein described, and that the surveyor of the public

*Barry* vs. *Gamble*.

lands in Missouri be, and he is hereby, directed to survey the quantity of land claimed in the place described in the petition, and grant or concession,—that he deliver to the petitioner a copy of such survey, and also do and perform," &c.

A patent for this land issued to Mackay's representatives, dated March 31st, 1841.

The plaintiff below, with a view to impeach the validity of the original concession of Delassus, gave in evidence, two depositions relating to the concession of an adjoining tract to Auguste Chouteau, and some admissions made by Mackay; but as the decision of the Circuit Court was based upon grounds entirely foreign to these matters, and the plaintiff derived no benefit whatever from this testimony, it is not deemed material that it should be noticed.

The defendant, Barry, also, for the purpose of showing the invalidity of the New Madrid location and patent, gave in evidence the president's proclamation, by which it appeared, that the lands in the township wherein this land lay was authorized to be sold in October, 1823.

This was all the evidence in the case, and upon this state of facts the Circuit Court instructed the jury, that the titles under the patent issued to Baptiste Lafluer, or his legal representatives, is a better title in law than the title under the confirmation to the heirs of Mackay, and therefore, under the agreement of the parties, the plaintiff is entitled to recover.

In investigating the respective value of these titles, the question which most naturally presents itself at the outset is, what is the effect of a confirmation under the act of 1824, and the acts supplementary thereto? If, as has been strongly urged at the bar, that confirmation was not a mere relinquishment of title, on the part of the United States, but a confirmation in law, as well as in terms; not a mere grant, but a confirmation recognizing the claim of Mackay as genuine and valid from its origin, good according to the laws of Spain, the treaty of cession, and the laws of the United States, and attaching itself, by relation, to the original concession, so as to exclude all intervening titles emanating from the federal government, the claim of the defendant in error is at an end.

The second section of the act of May 24, 1828, under which this claim was confirmed, would seem to leave this no longer an open question, but the zeal and ability with which this point has been urged by counsel, repels the supposition that it is yet considered settled.

A confirmation made under the act of 1824, and confirmations by statutory enactments subsequent to the investigation of the recorder and boards of commissioners, are unquestionably recognitions of pre-existing title, and not mere grants *de novo.*  By them, all the proprietary interest of the United States is vested in the claimant, and it is in terms and in effect acknowledged, that the title of the claimant was valid, under the law and usages of the former government, and protected by the treaty of cession.   It does not follow from this, however, that these confirmations recognize such claims as perfect and complete titles, or that they give them, as against other claimants, any more validity than they would have had under the former government.

And what was the condition and character of those concessions under the

government of Spain?—they were orders of survey, or directions of the surveyor to put a party in possession of a tract of land, which he prayed for the purpose of inhabitation or cultivation. It never was supposed that such orders gave the party a *title*, or, indeed, that the lieutenant-governor of Upper Louisiana had any authority to *grant* lands: so that, if the Spanish authorities at New Orleans failed or refused, from any cause, to perfect the title conceded by the commandants at St. Louis, and made a different disposition of the same land, it is not pretended that the grant of the intendant-general would not, according to the laws of Spain, prevail over the rights of the person who had the inchoate title. The government of the United States, then, succeeding to the rights, and assuming the duties of the king of Spain, has the same power to grant a complete title to one notwithstanding the existence of an inchoate right in another, and in such event, a subsequent confirmation to the party holding the prior right could avail nothing, the government having parted with their interest before the confirmation.

That Congress was fully apprised of this, will be seen by an examination of all their acts on this subject. By the 11th section of the act of May 26th, 1824, it is provided, that if, in any case, it should so happen, that the lands decreed to the claimant, under the provisions of this act, shall have been sold by the United States, or otherwise disposed of, or if the same shall have been heretofore located, it shall be lawful for the party interested to enter, after the same shall have been offered at public sale, the like quantity of lands in any land-office in the State of Missouri.

It is apparent, that if the confirmations made under this act were intended to operate upon the inchoate titles, so as to cut off all intervening claims originating under the United States, this section was entirely superfluous. No title could have emanated from the federal government previous to the origin of the Spanish claim ; and, upon the construction contended for, there would be nothing upon which this section could operate.

But the second section of the act of May 24, 1828, places this matter beyond controversy. That section declares, that " confirmations had by virtue of this act, and the patents issued thereon, shall operate only as relinquishments of title on the part of the United States, and shall in no wise affect the right or title, either in law or in equity, of adverse claimants of the same land."

Under this last act, the confirmation to Mackay's representatives was procured, and it cannot be doubted, whatever diversity of opinion may have existed in relation to the act of 1824, that this confirmation and patent amounted merely to a relinquishment of the title of the United States.

Such being the condition of the defendant's title, shall this confirmation in 1830 prevail over the patent of Lafleur in 1827? In other words, had the lands decreed to Mackay's representatives been sold by the United States, or otherwise disposed of, or had they been located, within the meaning of the eleventh section of the act of 1824 ?

By the provisions of an act to extend the time for locating Virginia military warrants, and for other purposes, passed March 2d, 1807, it was declared that

"no locations should be made on tracts of land for which patents had previously been issued, or which had been previously surveyed."

In the case of Lindsay and Others *vs.* Lessee of Miller (6 Peters' Rep., 672,) the Supreme Court of the United States were called upon to decide what surveys were protected by this proviso, and their conclusion was, that Congress did intend to protect surveys which had been irregurlarly made, but did not design to sanction *void* surveys.

Upon the authority of this case, as well as upon principle, it may be assumed, that the provisions of the eleventh section of the act of 1824 were not designed to protect sales or patents which were absolutely void; and the only matter remaining for inquiry, to decide the merits of the present case, will be, whether the patent issued to Lafluer in 1827 was void.

In the case of Hoofnagle *vs.* Anderson, (7 Wheaton, 212) the court held, that a patent was a title from its date, and conclusive against all those whose rights did not commence previous to its emanation.

In the case of Jackson *vs.* Clark and Others, (1 Peters' Rep., 628,) the same principle is asserted as the court held in the case of Lindsay and Others *vs.* Lessee of Miller, and an irregular survey was considered as protected by the proviso of the act of 1807.

In the case of Polk's Lessee *vs.* Wendall, (9 Cranch, 99,) the principle upon which that court has acted, in examining, at law, the validity of patents, is fully laid down and clearly illustrated. The chief justice, who delivered the opinion of the court in that case, said: "The laws for the sale of public lands provide many guards to secure the regularity of grants, to protect the *incipient rights of individuals*, and also to protect the State from imposition. Officers are appointed to superintend the business, and rules are framed, prescribing their duty. These rules are, in general, directory, and when all the proceedings are completed by a patent, issued by the authority of the State, a compliance with these rules is pre-supposed.

"That every pre-requisite has been performed, is an inference properly deducible, and which every man has a right to draw from the existence of the grant itself. It would, therefore, be extremely unreasonable to avoid a grant in any court, for irregularities in the conduct of those who are appointed by the Government to supervise the progressive course of a title from its commencement to its consummation in a patent.

"But there are some things so essential to the validity of a contract, that the great principles of justice and of law would be violated did there not exist some tribunal to which an injured party might appeal, and in which the means by which an elder title has been acquired might be examined."

After observing, that a court of equity is, in general, the most suitable tribunal for the adjustment of questions of this character, the judge proceeds:—"There are cases in which a grant is absolutely void; as, where the State has no title to the thing granted, or where the officer has no authority to issue the grant. *In such cases, the validity of the grant is necessarily examinable at law.*"

The general principle is here clearly laid down; the only difficulty is in ascertaining what acts are to be considered as irregularities, and what are essential to the validity of the grant. The facts upon which the court acted in that case, made out a case, in which the State attempted to convey lands to which they had no title. After the cession of a district of land from North Carolina to the United States, in 1789, North Carolina, by the terms of the deed of cession, had no authority to grant any more lands, except to such persons as had made entries prior to the cession.

It did not appear upon the face of the grant, that the title accrued before the cession, and the court allowed that matter to be examined into, and permitted the party contesting the patent to show that there was no entry, and no warrant authorized by the State of North Carolina, before the cession. Upon these facts appearing, the court held the patent void, for want of power in the State to make any such grant.

So, in the case of McConnell's Lessee *vs.* Wilcox, (13 Peters' Rep.,) it was held, that an entry with the receiver and register, of land expressly reserved from sale, was null.

In the case of Sarpy *vs.* Papin, (7 Mo. Rep.,) this Court held, that when an entry of land in the land-office had been made at a time when there was, by law, a reservation of the land from sale, and a patent issued after the reservation had been taken off, a party should not be permitted to go behind the patent to show such irregularity.

It is to be observed, however, that the opinion of the court in that case was founded on a mistaken assumption of the statute law. The act of May 22d, 1826, continuing the time of filing claims, under the act of May 26th, 1824, for two years longer, appears to have escaped the observation of the counsel in that case, as it certainly did of the court. The act is entitled, "An act for the relief of Phineas Underwood, and for other purposes;" and it is not singular, that neither the counsel nor the court should have thought of looking into an act with such a title, to find a general law respecting the settlement of land claims in Missouri. This act, not seeming from its title to be a public act, was not printed in Story's Compilation. The court proceeded on the assumption, that betwixt the expiration of the act of 1824 and the passage of the act of May 24th, 1828, there was an interval, during which the reservations of Spanish claims had been taken off by Congress, and the land declared public land, and, consequently, subject to be sold. That opinion, therefore, so far as that point is concerned, is entitled to no weight.

Where the State has no title to the land conveyed, it is obvious, that her grant can convey none; but what is meant by the court, in Polk's Lessee *vs.* Wendall, where they say, that it is also void when the officer has no authority to make the grant, admits of some doubt. Does the authority there spoken of apply to the incipient stages of the title, or to the period at which it is said to be consummated in a patent? Is it intended, that every step taken by the officers who superintend the stages of the title shall be in accordance with the mandates of the law? or was it meant merely, that when the title was perfected, and the grant issued, it should then be within the scope of the officers' power? It would seem, from the

general tone of the Opinion, that irregularities in the officers, or failure to comply with any of the mandatory provisions of the statute, were not sufficient to avoid the grant. In no case, perhaps, has the court gone further than it did in the case of Polk's Lessee *vs.* Wendall; and it may therefore be safely assumed, as the result of the authorities, that the irregularities of subordinate agents, in the incipient stages of a title, cannot be investigated for the purpose of impeaching the grant, unless the acts are such as are essential to the contract, *and on the performance of which depends the power and authority of the State to make the grant.*

The act of February 17, 1815, for the relief of the inhabitants of New Madrid who suffered by earthquakes, permitted the owners of lands in New Madrid, on making a relinquishment to the Government, of their lands in that county, to locate a like quantity on any of the public lands, "*the sale of which was authorized by law.*" What lands are embraced under this description? Did Congress mean that all the land which the president, by the act of March 3, 1811, was authorized to bring into market and dispose of in the manner prescribed by that act, should be subject to location? or were the claimants under this act of 1815 restricted to such lands as had been actually surveyed?

This question, it appears from the public documents, excited much discussion immediately after the passage of the act; and the counsel for the plaintiff in error lays much stress upon the official opinions of Mr. Wirt, who was the attorney-general of the United States at the time this discussion arose, and who held, that locations could not be made until after the surveys; and that locations made anterior to the public surveys were mere nullities. Great respect is due to the opinion of Mr. Wirt; but it must be recollected, that these opinions were *ex parte*, and if contemporaneous construction is to have any weight with a court in the construction of a law, it will be found that the officers of the Government who had charge of this branch of the public service, and who, called upon in their official capacity to act under the law, differed widely from Mr. Wirt on this subject.

A reference to the public document shows, that the commissioner of the general land-office, and the surveyor-general acting under his instructions, allowed locations to be made upon any lands not reserved from sale. (2 Land Laws, "Instr.," &c., pp. 815, 816.) It is true, that the action of the department was subsequently confirmed to the official opinion of the attorney-general; yet, as late as 1821, after a correspondence between Major Berry and the treasury department, in which it was agreed to avoid the objections of Mr. Wirt, that re-locations should be made, we find the commissioner of the general land-office adhering to his first opinion, and suggesting the probability of an act of Congress which would sanction the irregular locations. His letter to the surveyor-general thus concludes: "The directions of the secretary, sent in my letter of the 5th of July, (and to which you allude,) are not imperative. The location *may* be withdrawn. I presume the holders of them will wait to see what may be done at the next session of Congress."—2 Land Laws, "Opinions," &c.

Accordingly, we find an act passed on the 26th day of April, 1822, the first section of which declares, that "the locations heretofore made, of warrants issued under the act of 15th February, 1815, if made in pursuance of the provisions of

that act in other respects, shall be perfected into grants in like manner as if they had conformed to the sectional or quarter-sectional lines of the public surveys."

It may be admitted, that this act leaves the question open as to what lands were liable to be located under the original act of 1815, yet it certainly deprives those who advocated the narrow construction of that law, of the foundation on which all their objections were based. The only apology for their construction of the act of 1815 was, that the admirable system of our public surveys should not be infringed; and when Congress, in 1822, passed this act, which recognized the validity of locations which did not conform to the public surveys, it mattered nothing, so far as this system was concerned, whether the locations had been made previously or subsequently to the public surveys.

The act of 1815 was designed as a gratuity to those who had suffered by earthquakes. Humanity and charity prompted the law, however much it may have been perverted to the purposes of fraud and speculation. Is it reasonable that, with such motives avowed on the face of the act, Congress should have postponed the execution of their charitable purposes until the completion of the public surveys? The sales, it appears from the public documents, did not take place until 1818, and in the township whereon the present claim was located, until 1823.

But the act itself, giving it either construction, did infringe, to some extent, upon the subdivisional arrangements of the public surveys. All locations between one hundred and sixty, and six hundred and forty acres, were departures from the general system. Moreover, all locations, of every description, were, by the second section, required to be surveyed by the deputy surveyor, and a plat to be made out and returned to the recorder. If locations could only be made on lands after the public surveys, it is plain that the duties imposed by this section were, in many instances, superfluous. In locating any quantity of acres which corresponded with the section or sectional subdivisions, after the public surveys, no new survey would have been necessary.

If the words, "authorized to be sold," are to be construed in a strict or limited sense, why should locations be allowed, where only *one* of the pre-requisites of the law has been complied with? Why stop at a survey, and dispense with the other steps equally mandatory on the officers, before a sale could be regularly made? The mere survey did not bring lands into market; land offices were to be established, officers appointed, and due notice given by the proclamation of the president, before a sale could take place under the act of 1811.

Whatever may be the proper construction of these words, in the act of 1815, (and we leave that question *sub judice*,) the above views of the act and of the construction which it received immediately after its passage, will show, that the pre-requisites provided by the act of 1811 were all on a like footing; that a survey, the establishment of land offices, the appointment of officers to superintend the sales, and a due notice of the time of sale by proclamation of the president, were all alike preliminary to a valid disposition of the public lands; that they were all duties entrusted to the president of the United States, and could all be performed without any further action on the part of Congress; that the locators under the act of 1815 were not in any worse condition, at least, than those who

13

were authorized to buy at public sale, and consequently these preliminary steps in obtaining the complete title, under the superintendence of the officers appointed by Government for that purpose, must be presumed to be regular, when a patent has issued, unless it can be made to appear, that when the location was made, the land was *expressly reserved from sale.*

This will be permitted, though the patent on its face is regular, and the facts must appear *aliunde,* and this is going as far as the doctrine of the court in Polk's Lessee *vs.* Wendall will warrant.

Let us, then, see whether this land, when the location was made, was expressly reserved from sale by the act of 1811. After reserving sixteenth sections, mineral lands, and salt springs, it is provided, "that, till after the decision of Congress thereon, no tract of land shall be offered for sale, the claim to which has been in *due time, and according to law,* presented to the recorder of land titles in the district of Louisiana, and filed in his office, for the purpose of being investigated by the commissioners appointed for ascertaining the rights of persons claiming lands in the territory of Louisiana." Now, what was the law in relation to the time of filing these claims, when this act was passed? The fourth section of the act of 2d March, 1805, (Land Laws, p. 123,) declared, that every person claiming lands in the territory, by any French or Spanish grant made and completed before the 1st of October, 1800, or by virtue of any incomplete title, should, before the 1st of March, 1806, file with the register of the land-office or recorder of land titles, a notice of his claim; and further declared, that if any one failed to do so, such grant or incomplete title should never after be admitted as evidence in any court of the United States *against any grant derived from the United States.*

The fifth section of the act of March 3, 1807, extended the time of filing claims to the 1st of July, 1808, and declares, "that the rights of such persons as shall neglect so doing, within the time limited by this act, shall, so far as they are derived from or founded on any act of Congress, ever after be barred and become void, and the evidences of their claims never after admitted as evidence, in any court of law or equity whatever."

Such was the law at the time of the passage of the act of 1811. The act of February 17, 1818, makes provision for the establishment of additional land offices in the territory of Missouri; and the third section directs the president to offer for sale the surveyed lands, with the "same reservations and exceptions, and on the same terms and conditions," as was provided in the tenth section of the act of 1811.

The act of 13th June, 1812, allows *actual settlers* further time to file their claims; but it is clear, that all claims which were not filed with the recorder by the 1st July, 1808, were not within the reservation of the tenth section of the act of 1811,—they had not been filed in *due time,* and *according to law.*

The claim of Mackay, it appears from his petition to the District Court in 1829, had not been filed with the recorder, or brought before any board of commissioners: it was, therefore, not within the reservation of the act of March 3, 1811.

Congress, it is true, may disregard these acts of limitation, and may admit

claims, as they did by the act of 1824, to be presented to their courts, notwithstanding they may have been barred; but this must not be to the prejudice of those rights which have accrued upon the faith of prior acts. When the patent issued to Baptiste Lafieur in 1827, there was no evidence on the public records of any claim set up by Mackay to the land in controversy: so far as that title depended upon the United States, it was barred, both at law and equity, by the acts of 1807 and 1811, and 1818. Up to 1827, when this patent issued, no effort, even under the act of 1824, was made by Mackay to bring this claim before the District Court of the United States; and it was not until 1829, two years after the patent had issued to Lafleur, that the claim was set up for the first time.

It was then too late; the United States had parted with their interest to Lafleur's representatives; and if Mackay's representatives had a title, such as the Supreme Court of the United States decided it to be, good according to the laws and usages of Spain, and protected by the treaty, which by delay was not ripened into a perfect title until after the fee had passed from the United States to another, they cannot justly complain of any breach of faith on the part of the United States.

The statutes of limitation, passed from time to time, advised them of the wishes of Congress: their claim being barred by these acts, they seek the bounty held out by the act of 1828, and must take it on the terms prescribed in the act.

Judgment affirmed.