## ADAIR v. METTE, Appellant.

### In Banc, June 4, 1900.

1. **Witness: INCOMPETENT: OBJECTION TO EVIDENCE.** An objection to the questions and answers in the examination of a witness as being incompetent, is not an objection to the incompetency of the witness to testify.

2. **Evidence: NO OBJECTION.** An appellant is not in a position to urge that evidence admitted at the trial was error unless at some time during the progress of the trial the same objection complained of on appeal was lodged against it.

3. **Common Law Marriage: EVIDENCE: INSTRUCTIONS.** It is error to instruct the jury that they may infer a marriage if the man and woman "consented and agreed with each other to be husband and wife;" and that "the jury may infer such consent and agreement existed if they believe and find from all the evidence that" said man and woman for four years prior to their making what purported to be an ante-nuptial contract, "lived together and cohabited together as husband and wife, and had children born which he acknowledged to be his children and treated as his, and held themselves out to be husband and wife, and were reputed to be husband and wife in the neighborhood where they lived," and that if they find these facts they should disregard the ante-nuptial contract thereafter made and the rector's subsequent certificate of marriage and many other contracts and deeds executed by or to the woman in her name by a former husband. A jury should not be instructed that marriage may be inferred from "acknowledgment, cohabitation and reputation," regardless of a subsequent marriage contract and other evidence tending to prove that the parties were not married.

4. **Adverse Possession: PRIOR POSSESSION.** The defendant, in order to make ten years adverse possession of land, may tack his actual possession to that of his predecessors in the title.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

REVERSED AND REMANDED.

*McKeighan, Barclay & Watts* and *John N. Straat* for appellant.

(1) The trial court erred in permitting the plaintiff to testify, against the objection and exception of defendant, to statements by Thomas J. Payne (through whom defendant claimed title) in the nature of admissions of the alleged common law marriage, said Payne being deceased at the time of the trial, and plaintiff being interested in the event of the suit. Chapman v. Daugherty, 87 Mo. 620; Emmel v. Hayes, 102 Mo. 186; Lins v. Lenhardt, 127 Mo. 271; Nowack v. Berger, 133 Mo. 24; Hopkins v. Bowers, 111 N. C. 175; 29 Am. and Eng. Ency. of Law, p. 728. (2) The court erred in the instructions given for the plaintiff at the trial. (a) The last part of plaintiff's first instruction was a misleading comment on the evidence, and put out of view the important fact of the marriage contract on the issue of whether or not there had been a prior common law marriage. McDermott v. Barnard, 19 Mo. 204; Glover v. Duhle, 19 Mo. 360; Railroad v. St. L. Union Stock Yards, 120 Mo. 541; McFadin v. Catron, 120 Mo. 274; State v. Swils, 105 Mo. 531; Barr v. Kansas City, 105 Mo. 557; Honey v. Kansas City, 94 Mo. 334. (b) The second of plaintiff's instructions repeated the error of the first and made it worse. (c) The third instruction for the plaintiff deprived defendant (on his plea of the statute of limitations) of the benefit of any adverse possession of the lot by his predecessors in title, under whom he claimed by regular conveyances, and hence it was fatally erroneous. Chouquette v. Barada, 23 Mo. 337; Menkens v. Blumenthal, 27 Mo. 198; Shaw v. Nicholay, 30 Mo. 99. (3)

VOL. 156 mo—32

The court erred in not sustaining the defendant's motion for a new trial on the ground that the verdict was against the evidence in the cause.

*John J. O'Connor* for respondent.

(1) A general objection to the admission of evidence on the ground that it is "incompetent, irrelevant and immaterial," does not suffice, if at the time it is offered, it is material for any purpose. The court is entitled to have the specific reason if any exist, and the objector's failure to express the specific reason, destroys the value of the objection, if the same be overruled by the trial court. State v. Adams, 108 Mo. 216; Margrave v. Ausmuss, 51 Mo. 561; Kim v. Railway Transit Co., 90 Mo. 314; Sligman v. Rogers, 113 Mo. 654. And no objection or exception not saved in the bill of exceptions can be considered in this court. Bray v. Kremp, 113 Mo. 552; Clark v. Conway, 23 Mo. 438. At any event respondent was competent to testify to what she saw with her own eyes, or heard with her own ears as to the conduct between her mother and Payne, so long as it did not refer to the making, contents or delivery of the alleged marriage contract. Shanklin v. McCracken, 140 Mo. 348. Besides all this the appellant waived his right to object to respondent testifying, even if he had such a right. By cross-examining her, he made her his own witness. Hune v. Hopkins, 140 Mo. 65. (2) Instructions should be taken together and when so considered, if they declare the law sufficiently favorable to the appellant he can not complain. Ridenhour v. Railroad, 102 Mo. 270. And it is not error to give an instruction which omits a necessary word, or when taken by itself, is erroneous, if when read in connection with others given, the word is supplied and the law is correctly declared. Imp. Co. v. Ritchie, 143 Mo. 587. (3) Marriage at common law is only a contract which may be entered into by the parties alone

without the presence or consent of a minister or officer of the law and without the accompaniment of any ceremony, and a marriage thus contracted between parties capable of contracting marriage can not be annulled by the subsequent acts of either or both of the parties thereto. And the existence of such a contract may be inferred from the acts of the parties thereto. Dyer v. Brannock, 66 Mo. 396; Cargile v. Wood, 63 Mo. 501; State v. Bittick, 103 Mo. 191; 2 Greenleaf on Ev., p. 513; 1 Bishop on Marriage and Divorce, sec. 283. (4) If plaintiff's mother and Payne were husband and wife at and prior to November 10, 1846, then the marriage contract is absolutely void, and could vest no power in Payne to make any disposition of her lands for a longer term than during the existence of the marriage or during the term of his own life, because a married woman could not convey or encumber her land under the statute or common law then in force, except by a deed joined with her husband, duly executed by her on private examination of the officer taking her acknowledgment or by a will, unless where the land was part of a separate estate, which was not so in this case. Secs. 669, 670, 680, 681, R. S. 1879; Shaffer v. Kugler, 107 Mo. 62; Bartlett v. O'Donoghone, 72 Mo. 564; Hoskinson v. Adkins, 77 Mo. 537; Goff v. Roberts, 72 Mo. 570; Miller v. Miller, 78 Ia. 117; Mueller v. Kaessmann, 84 Mo. 329. (5) The contract if taken as a deed is clearly void for want of proper acknowledgment. Wannell v. Kem, 57 Mo. 478; McCollum v. Boughton, 132 Mo. 622; R. S. 1879, secs. 669, 670, 680, 681. (6) A void deed may create color of title to enable one holding thereunder for more than ten years to set up adverse possession. But in the case of co-tenants, where one tenant is not in possession, the holding of the other co-tenants in possession will not start the statute of limitations to run, unless notice be actually brought home to the absent tenant that his co-tenants in possession are holding or claiming to hold the land under color of title ad-

versely to him. McQuiddy v. Ware, 67 Mo. 74; Zeller's Lessee v. Eckert, 4 How. 289 (U. S.); McClusky v. Barr, 47 Fed. Rep. 154. Besides the question of adverse possession, where the evidence is conflicting, is a fact to be determined by the jury under proper instructions, which has been done. Wilson v. Taylor, 119 Mo. 632.

BRACE, J.—This case was submitted on briefs and decided in Division No. 2. In due time a motion for rehearing was filed, sustained, and the case reargued in that division, whereupon the case was transferred to Court in Banc, and now stands for decision on that motion. The following statement of the case is from the divisional opinion of BURGESS, J.:

"This is an action of ejectment for the possession of one undivided third of a lot of ground in the city of St. Louis. The petition is in the usual form. The answer admits possession, denies all other allegations in the petition, and sets up the statute of limitations as a bar to the action. Plaintiff had judgment in the court below for possession of the property sued for and $440 damages. The one-third interest in the monthly rents and profits was fixed at $6.66 per month. Plaintiff remitted $140 of the damages. After an unsuccessful motion for a new trial defendant appealed.

"Plaintiff is the daughter of Mrs. Mary Jones Payne, who was, at the time of her death in 1853, the owner in fee simple of the land involved in this litigation. Mary Jones Payne was twice married, the first time to plaintiff's father (Jones), by whom she had two children, the plaintiff and a brother, the latter of whom died before his mother, unmarried. Jones having died, his widow in 1840 contracted and maintained marital relations with one Thomas J. Payne, with whom she lived as his wife until 1846, during which time they had born to them two children, viz., Bryan Mullanphy Payne and Thomas Jefferson Payne, Jr. In 1846

Mary Jones Payne entered into a marriage contract with said Thomas J. Payne, by which she agreed with him, in consideration for his promise to marry her, to give to him all her property, including the land in question, to be held in trust for her during her life, and after his death the land to go to her two sons above named and Benjamin F. Payne, a son of Payne's by a former marriage, and to any other child or children that might be born after the promised marriage. Another child was born, namely, Edward Howard Payne, but Bryan Mullanphy Payne died in infancy, so that at the time of Mary's death there survived her but three children, namely, Thomas Jefferson Payne, Jr., and Edward Howard Payne, and the plaintiff, whose name was Jones, but she intermarried with a man named Mattox, who died, and then she thereafter intermarried with her present husband, Adair. One of the provisions of the said contract provides that under no circumstances should plaintiff receive or inherit any part or portion of her mother's property.

"This contract purports on its face to have been duly executed by plaintiff's mother before a notary public. But there was evidence tending to show that Mary never did sign or execute said contract; and there is no claim that the contract so far as it could affect the title of Mary's land was executed in conformity to the statutes then in force.

"In the winter of 1846, after making the marriage contract, plaintiff's mother and Payne were legally married by a minister of the gospel. Thereafter Payne and his wife moved from St. Louis to St. Charles county, Missouri, where they lived until 1853, when she died intestate. Thereupon Payne took control of all the land owned by his deceased wife, and collected the rents thereof until his death, which occurred in 1867.

"Defendant read in evidence, over plaintiff's objection, two powers of attorney, claimed to have been made by Mrs.

Payne in her lifetime to Payne, by virtue of which and by virtue of the terms of the said marriage contract, he (Payne) after her death leased the land in question for ninety-nine years, which lease was read in evidence, over plaintiff's objection.

"After his death all the land in question was taken possession of by her two brothers, namely, Thomas Jefferson Payne and Edward Howard Payne and the heirs of the said Benjamin Howard Payne, he having died one or two days after the death of his father, and they or their heirs held and controlled said land until 1889, when the property was partitioned in a partition proceeding had in the circuit court of the city of St. Louis, but the plaintiff was not made a party to said suit. The evidence further shows that plaintiff never had any knowledge that the land in question belonged to her mother, or that her said brothers had possession thereof, until about 1889, after the aforesaid partition proceedings were concluded.

"The powers of attorney were not of record, and neither of them was acknowledged or executed by Mary Jones Payne as required by statute, and there was evidence tending to show she did not sign or execute them.

"The defendant went into possession of the land in 18—, under a lease given by Payne after the death of his wife, for ninety-nine years and continued as a tenant under said lease until 1890, when, after the partition proceeding aforesaid, he purchased it from the grantee holding under said partition sale, and he has continued in possession ever since, but has paid no rent since 1890 under said lease.

"It is insisted by defendant that the marriage contract between Mrs. Payne and Thomas Jefferson Payne is a valid instrument, and as by its express terms plaintiff is excluded from any interest in her mother's estate, she is not entitled to recover in this action. Upon the other hand, it is claimed by plaintiff that at the time the contract was entered into,

if at all, plaintiff's mother and Thomas Jefferson Payne were living together as husband and wife under a common law marriage, and that she could not convey or encumber her land under the statute or common law then in force, except by deed joined with her husband, executed as required by statute, and as this was not done the marriage contract is absolutely void."

(1)  It is now urged for reversal that "the trial court erred in permitting the plaintiff to testify against the objection and exception of defendant, to statements by Thomas J. Payne (through whom defendant claimed title) in the nature of admissions of the alleged common law marriage, said Payne being deceased at the time of the trial, and plaintiff being interested in the event of the suit."

"The statements" with "the objections and exceptions" referred to in this contention, are manifested by the following extract from the abstract:

"Q.  Did you know a man by the name of Thomas Payne?  A.  Yes, sir.

"Q.  When did you first get to know him?  A.  From 1839, on as long as he lived.

"Q.  How long had you been in St. Louis before you got acquainted with Thomas Payne?  A.  He was about the first that came to the camps.

"Q.  You came here in the spring of 1839?  A.  Yes, sir.

"Q.  Was it during the same year that Mr. Payne showed up?  A.  Yes, sir.

"Q.  When you went to live on Grand Avenue where did Mr. Payne live?  A.  He lived with my mother.

"Q.  In the same house?  A.  Yes, sir.

"Q.  How did they live together?  A.  I should think they were man and wife; we had there a little brother, Thomas Jefferson Payne, before we moved to Grand Avenue.

"Q. About when did that first commence, in regard to the year; you say you came here in 1839 and moved there in 1842? A. Yes, sir.

"Q. Did Mr. Payne commence to live with your mother before you lived on Grand Avenue or after? A. Before.

"Q. Did they occupy the same room? A. Yes, sir.

"Q. Did they occupy the same bed? A. Yes, sir.

"Q. Now, during the time your mother and Mr. Payne were living together in 1842 or 1843, did your mother have any child born? A. Yes, sir.

"Q. What was its name? A. Thomas Jefferson.

"Q. Was Mr. Payne there at that time? A. Yes, sir.

"Q. Did you ever hear Mr. Payne speak of the child or say who its father was?

"Defendant's counsel objects to the question.

"A. He took me to him and told me it was my little brother.

"Plaintiff's counsel withdraws the question.

"Q. Did you hear any conversation with Mr. Payne, with your mother, or with yourself about the child?

"Defendant's counsel objects to the question as incompetent, irrelevant and immaterial.

"Mr. Straat: There is no controversy about the fact that Mary was the mother of children born out of lawful wedlock. Thomas J. and Bryan Mullanphy were born out of lawful wedlock.

"The court overrules the objection, to which ruling of the court defendant at the time duly excepts.

"A. He took me to the bed after the child was born and said it was my little brother, Thomas Jefferson Payne, and I was too young then to think anything wrong about my mother.

"Q. Did you ever hear Mr. Payne introduce your mother, or speak about your mother to any other persons, between 1841 and 1846, and if so, state to the jury how and what he said of her with regard—I mean how he addressed her, what name he called her?

"Defendant's counsel objects to the question as incompetent and irrelevant; objection overruled; defendant at the time duly excepts.

"A. He called her Mrs. Payne.

"Q. To whom did he call her Mrs. Payne? A. To the neighbors, Mrs. Clements.

"Q. Can you remember the names of others now? A. Yes, sir.

"Q. How close did the Clements live? A. Well, not very far, they were regular visitors.

"Q. How far did the Ermines live from your house? A. A few blocks.

"Q. The other people you spoke of, were they neighbors, too? A. They lived just across the street.

"Q. Have you heard your mother introduce Mr. Payne to others, and if so, what did she call him?

"Defendant's counsel objects to the question as incompetent, irrelevant and immaterial.

"A. She called him papa, Mr. Payne.

"Q. What did she call him? A. She called him Mr. Payne in company, and papa at home every day; Mr. Payne in company and papa in the family.

"Q. Did she have any conversation with you about Mr. Payne, in which she spoke about what relations existed between your mother and Mr. Payne, and if so, state what she said?

"Defendant's counsel objects to the question as incompetent, irrelevant and immaterial; objection overruled; defendant at the time duly excepts.

"A.   I called him my father, she called him my father to me, I didn't know the difference, my father and mother.

"Q.   Did you hear her say anything else about him? A.   No, sir.

"By the Court:   Q.   How old were you at this time? A.   I was nine or ten—about eleven years old.

"Q.   You never went under the name of Payne?   A. No, sir.

"Q.   You were not old enough to tell the difference between Payne and Jones if you were Jones and your brother was Payne?   A.   I knew my mother was named Jones and afterwards her name was Payne.

"Q.   You spoke about your father?   A.   My step-father.

"By Mr. O'Connor:   Q.   When did she commence to be called Payne by the neighbors?   A.   About 1842.

"Q.   Did that continue until the time she died?   A. Yes, sir.

"Q.   The first part of 1846 or the latter part of 1845, where were you then living?   A.   I was living just below Grand Avenue a little ways, on the farm belonging to my mother."

The specific objection now urged against this evidence, is that the plaintiff was not a competent witness in the case. It will be observed from the foregoing proceedings that *this* objection was not made to the evidence on the trial, nor was it made in the motion for new trial, nor even in this court before the motion for rehearing.

In fact, upon the trial no objections were made, nor exceptions taken to the admission of the evidence.   The objections and exceptions going only to the questions asked and not to the answers returned, but waiving this informality the evidence elicited was in itself both relevant and material, and being so was competent, unless impaired by some extrinsic fact to which the attention of the court should have

been called by a specific objection.   The extrinsic fact al-
leged, the personal disqualification of the witness to testify
in the case, now for the first time specifically presented as
a ground of objection to the evidence, was not thus called to
the attention of the trial court by the general objections
*to the evidence itself*, as incompetent, immaterial and irrele-
vant, and not having been so called, the appellant is not now,
nor ever has been in a position in this court to ask for a re-
versal on this ground, under its rulings so oft repeated that
we cite but a few of the cases:   Three States Lumber Co.
v. Rogers, 145 Mo. 445; State v. Wright, 134 Mo. 404;
People's Bank v. Scalzo, 127 Mo. 164; Morgan v. Joy, 121
Mo. 677; Stone v. Hunt, 114 Mo. 66; Seligman v. Rogers,
113 Mo. 642; State v. Hope, 100 Mo. 347; Russell v. Glass-
er, 93 Mo. 353; Gerr v. Redman, 92 Mo. 375; Allen v. Mans-
field, 82 Mo. 688; Hill v. Alexander, 77 Mo. 296; Margrave
v. Ausmuss, 51 Mo. 561; Clark v. Conway, 23 Mo. 438;
Fields v. Hunter, 8 Mo. 98.

(2)   It is also urged that the trial court erred in the
following instructions given for the plaintiff:

"1.   The court instructs the jury' that marriage is a
civil contract, and it is not necessary that the same shall be
solemnized before a minister of the gospel, or an officer of
the law; and if they believe from the evidence that at any
time prior to the 10th day of November, 1846, the said
Mary Jones was the mother of plaintiff, and that she and
Thomas J. Payne, Sr., at the city of St. Louis, consented and
agreed with each other to be husband and wife, and cohab-
ited together as such husband and wife, and that they were
so reputed in the neighborhood where they lived as such
husband and wife, and that prior to such 10th day of No-
vember, 1846, she bore him two children which he acknowl-
edged and treated as his children, then such facts, if you so
find from the evidence, constitute a lawful marriage, and no
subsequent acts or demonstrations by them, or either of

them, could in anywise annul such marriage. And with reference to the words "consented and agreed," as used above in this instruction, the jury are instructed that it is not necessary that the same should be proven by the testimony of a living witness. The jury may infer that such consent and agreement existed between said Mary and Thomas, if they believe and find from all the evidence that said Mary and Thomas, from about 1842 to the 10th day of November, 1846, lived together and cohabited together as husband and wife, and had children born which he acknowledged to be his children, and treated as his children, and that they held themselves out to be husband and wife, and were reputed to be husband and wife in the neighborhood where they lived.

"2.    The court instructs the jury that the paper read in evidence by defendant's counsel and which is called an antenuptial contract, is of no force or effect, and should receive no consideration by them, if they find and believe from all the facts and circumstances in evidence that prior to the 10th day of November, 1846, the said Mary Jones Payne and the said Thomas J. Payne, Sr., had lived together and cohabited together as husband and wife for two or more years, and during said time had children born which he acknowledged to be his children, and held themselves out to be husband and wife, and treated each other as husband and wife, and were reputed to be husband and wife in the neighborhood where they lived.

"3.    The court instructs the jury that if they find and believe from the evidence that plaintiff is the daughter of Mary Jones Payne, and that the said Mary was the owner in fee simple of the land in question at the time of her death, and that prior to the 10th day of November, 1846, the said Mary and Thomas J. Payne, Sr., were husband and wife, and that the said Mary departed this life during the year 1853, intestate, and that the said Thomas J. Payne, Sr., sur-

vived her, and controlled said land either as the husband or trustee of Mary deceased, from the time of her death until about the year 1867, when he died, and that the said Mary left surviving her only two other children, named Thomas J. Payne, Jr., and Howard Payne, and that said two chldren with or without any other person controlled said land until about the year 1889, and that the defendant has not occupied and held said land openly and notoriously under a claim of ownership adverse to plaintiff for a period of ten years before the filing of this action, their verdict must be for the plaintiff."

The question of fact in the case to be determined by the jury, on the evidence, under instructions 1 and 2, was, whether at any time prior to the 10th day of November, 1846, Mary Jones and Thomas J. Payne had lawfully intermarried with each other? The burden of proving that fact was on the plaintiff. All the testimony on her part in support of that issue consisted of her own evidence hereinbefore set out, and the deposition of another witness, as follows:

"Nancy Ermin, by deposition, testified in substance as follows: I am 81 years old; am a widow; have resided fifty-five years in the city of St. Louis; recollect some things that occurred in 1840 and along there. About 1841 I knew Thomas J. Payne and Mary Jones. Mary Jones had a daughter living with her, the plaintiff in this suit. I do not know exactly what years I knew them; I can not say that I knew them from 1842 to 1846. I can not state with certainty when my husband died; I do remember the time my husband died. Before I came to St. Louis I had a son named Henry, born near Wheeling; he was about 4 months old when I came to St. Louis; he is over 50 years old; he was between 2 and 3 years old when I became acquainted with Mr. Payne and Mrs. Jones. I never was at their house. I saw Mr. Payne go to Mrs. Jones's house with a buggy; I did not see him go away. She visited my house and I called her

Mrs. Payne. I have seen them together, but don't know how he treated her. I suppose they lived together, but do not know. I called her Mrs. Payne because I heard others call her Mrs. Payne. I lived for about nine months, not any longer, within two blocks of Mrs. Jones; it was during these nine months that I called her Mrs. Payne. I then moved away on the same farm, about a half mile from the Paynes; after I moved I never saw Mr. Payne and Mrs. Payne."

On cross-examination, she testified:

"Q. Mrs. Ermin, your knowledge then of Mr. Payne and Mrs. Jones covered a period of about nine months while you were living near where Mrs. Jones lived? A. Yes, sir; and I can not state with certainty what period of time that was. I have spoken to Mr. Payne on several occasions, but I did not have any conversations with him.

"Q. Did you ever have any conversation with Mr. Payne as to his relations with Mrs. Jones? A. No.

"Q. Did you ever have any conversation with Mrs. Jones as to her relations with Mr. Payne? A. No. During the nine months spoken of I heard Mrs. Wible call Mrs. Jones, Mrs. Payne. I don't remember any one else calling her Mrs. Payne. At that time Mrs. Wible lived on Grand Avenue, three or four blocks from where I lived. There was no street there then. I have no idea how often I spoke to Mrs. Jones during those nine months. Sometimes I would see her twice a day, and then again I would not see her for a week at times."

On re-direct examination she said:

"On the occasion when I spoke to Mr. Payne I never spoke to him about his wife, nor did he ever mention her name to me. There were children there. I supposed they were belonging to Mr. and Mrs. Payne. There was one boy about two years old. The other one I can not remember of seeing at all. He was small."

The evidence in rebuttal thereof introduced by the de-

.fendant was the marriage contract of November 6th, 1846, in which they held themselves out as unmarried; a certificate of their subsequent marriage on the 16th of November, 1846, by the rector of St. George's Church, St. Louis; and the following instruments of writing:

1.  Deed from John O'Fallon to Mary Jones, ·dated July 9, 1846, duly acknowledged and recorded.

2.  Deed from Mary Jones to John O'Fallon, dated July 11, 1846, duly acknowledged and recorded.  This is the deed signed "Mary Jones."   (X her mark.)

3.  Deed from Mary Jones to Josiah Spaulding and P. Dexter Tiffany, dated July 25, 1846, duly acknowledged and recorded.

4.  Deed from Mary Jones to P. Dexter Tiffany, dated July 25, 1846, duly acknowledged and recorded.

5.  Power of attorney executed by Mary Jones, constituting Thomas J. Payne her attorney in fact, dated August 13, 1846, duly acknowledged.

6.  Power of attorney, executed by Mary Jones, dated August 13, 1846, constituting Thomas J. Payne her attorney in fact, duly acknowledged.

7.  Deed from Franklin Niles to Mary Jones, dated August 25, 1846, duly acknowledged and recorded.

The five instruments numbered 2, 3, 4, 5 and 6, as also the marriage contract, dated November 10, 1846, which is duly acknowledged and recorded, are all signed "Mary Jones."

In Banks v. Galbraith, 149 Mo. loc. cit. 536, marriage is defined to be "a civil contract by one man and one woman competent to contract whereby they are mutually bound to each other so long as they both shall live, for the discharge, to each other and the community, of the duties and obligations which flow by law from such relation (State v. Bittick, 103 Mo. 183), and such contract is not dissolvable at the will of either or both of said parties."   It devolved upon the

plaintiff to prove such a contract. "It is a present and per-
fect consent, the which alone maketh matrimony without
either public solemnization or carnal copulation, for neither
is the one, nor the other, the essence of matrimony, but con-
sent only" (Swinburne). In Cargile v. Wood, 63 Mo. loc.
cit. 512, it was held that, "Where parties have cohabited
together and held themselves out as man and wife, and there
are circumstances from which a present contract may be in-
ferred, the law, out of charity and in favor of innocence
and good morals, will presume matrimony. The law in gen-
eral presumes against vice and immorality, and on this
ground holds acknowledgment, cohabitation and reputation
presumptive evidence of marriage." Mr. Bishop, citing this,
and other cases, in support of the text, states the doctrine a
little more tersely thus: "When a man and woman are liv-
ing together in apparent matrimony, so that they are ac-
cepted by the community as husband and wife, they are pre-
sumed, in the absence of counter presumptions or proofs,
not to be violating the due order of society and breaking the
law, but to be in fact married." [1 Bishop, New Work on
Mar., Div. and Sep., sec. 932.] The vice of these two in-
structions, when read together is, that in the first the jury
are in effect told that they may infer a marriage from
"acknowledgment, cohabitation and reputation," regardless
of the circumstances in evidence in the case tending to prove
that in fact they were not married prior to the 16th of No-
vember, 1846; while in the second instruction they are told
to disregard the strongest and most potent fact, i. e., the
"ante-nuptial contract," in that chain of circumstances, as
of "no force or effect" and "to give it no consideration" as
against such inference. Thus for all practical purposes ren-
dering the inference conclusive, and destroying the defense
—by converting what in law is only a rebutable presumption
into a conclusive one in effect. This was palpable and pre-
judicial error for which the judgment should be reversed.

The trial court also erred in the third instruction, in limiting the possession to the defendant who was entitled to make out title to the premises under the statute by tacking his actual possession to that of his predecessors in the title. This error was not eliminated by the instructions given for the defendant on that issue, and it is doubtful if it was cured thereby. At all events, the judgment of the circuit court ought to be reversed and the cause remanded for new trial for the errors in the instructions before mentioned.

*Gantt, C. J., Robinson, Marshall* and *Valliant, JJ.*, concur in the opinion, except that *Marshall, J.*, is of the opinion that the judgment should be reversed without remanding, upon the ground that there is no substantial evidence upon which a judgment for the plaintiff could be sustained; *Sherwood, J.*, concurs in reversing the judgment and remanding the cause for error in the instructions; *Burgess, J.*, concurs in the first paragraph, and dissents as to the second.

It is, therefore, ordered that the judgment of the circuit court be reversed and the cause remanded for new trial.