MARY HUTCHINSON v. RICHMOND SAFETY GATE COMPANY and MONTGOMERY WARD & COMPANY, Appellants.

Division One, December 24, 1912.

1. **NEGLIGENCE: Drilling Holes in Wall of Elevator Shaft: Protruding Body Into Shaft: Struck by Elevator: Liability of Lessee: Demurrer.** Where an employee of the building contractor was put to work by the foreman in placing fire rollers on the inner wall of the elevator shaft; to do so he had to drill a hole through the fourteen-inch brick wall of the shaft, eight or ten inches above the floor and six to ten inches back from the face of the doorway of the elevator; he did the work in the same manner that other employees had been doing it, namely, by kneeling or lying on the floor of the building and protruding his head and arms into or through the opening in the elevator shaft, and reaching around to the place where the bolts were to be inserted and the rollers were to be fastened; there was great noise from the moving of freight into the building and the large number of workmen at work on the elevator shaft and in the building; while he was in that position the elevator struck him without notice; and, the operator of the elevator, who was an employee of the lessee of the building, in coming down on the last previous trip before deceased was struck, gave him notice from the first floor above, and in going up gave him notice from the first floor below, but in coming

down on the trip he was struck, gave him no notice that could have been heard, the court cannot declare as a matter of law that the lessee's demurrer to deceased's wife's case should have been sustained. There was nothing necessarily dangerous in the mode of doing the work; certainly no danger so obvious and imminent that no person of ordinary prudence would have pursued the mode.

2. ——: ——; ——: ——: **Assumption of Risks.** The danger arising from the wanton and negligent conduct of the lessee of a building, or of his employee in charge of an elevator therein, is not a risk assumed by the employee of the builder engaged at work on the elevator shaft. Such employee is not required to presume that those in charge of the elevator will be negligent, whether the elevator be under the control of the lessee or builder or both.

3. ——: ——: ——: ——: **Liability of Lessee: Duty to Employee of Contractor.** The lessee of an unfinished building, who enters into it while the workmen are still engaged in constructing it, adopts and ratifies the invitation the contractor has extended to his employees to enter it and to engage in work thereon; and such lessee assumes the duties the owner or the contractor owes to the contractor's employees not to negligently injure them, and to notify them of the danger.

4. ——: **Evidence: Warning: Pitch of Voice: Demonstration.** There being evidence that the operator of the elevator, which struck deceased as, at his work, his head and shoulders projected into the elevator shaft at the doorway on the fifth floor, shouted from the ninth floor, "Look out below," as he started down; and there being also testimony that the noise made by the many workmen was so great that no person on one floor could be heard to speak by a person on another; and the question of whether deceased heard the warning of the elevator operator being material, it was not prejudicial to compel the witness to demonstrate how loud the words were shouted, by repeating them before the jury with the same volume of voice in which they were uttered.

5. ——: **Contractor's Knowledge of Danger to Employee and Duty to Notify Imputed to Lessee of Unfinished Building.** Where the lessee of a building entered into possession before the building was completed, and operated the elevator which struck and killed a servant of the contractor at work on the shaft, and acquiesced in the continuation of that work, said lessee assumed the duties and obligations resting upon the contractor to furnish his employee with a reasonably safe place in which to work and to notify him of any approaching danger known to him and not known to the servant; and there being positive evidence that the contractor knew and the

servant did not know, it was not error to instruct the jury that if said lessee "knew or by the exercise of ordinary care could know that said deceased was required to place a part of his body in the shaftway of the elevator in doing said work," and ran the elevator upon him without warning, a verdict against said lessee would be proper.

6. ———: **Instruction: Presumption of Ordinary Care.** These words in the instruction for plaintiff were not error: "You are further instructed, if you find no evidence or circumstances to the contrary, you may assume that the deceased at the time he was injured was in the exercise of ordinary care." They do not violate the rule that it is erroneous to instruct the jury that they may presume a certain thing to be true when testimony in the case tends to prove or disprove that thing; they authorized the jury to assume deceased was in the exercise of ordinary care only upon condition that they also found there was no evidence or fact tending to show he was negligent.

7. **WITNESS: Called by Defendant: Recalled by Plaintiff in Rebuttal for Impeachment.** Whenever a party to a suit introduces a witness, he is the witness of that party for all purposes throughout the case. So that where defendant called the elevator operator, it was not error to permit plaintiff to recall him in rebuttal and ask him if he made certain exclamations at the time of striking deceased with his elevator, and upon his answering in the negative, to proceed to impeach him by showing by other witnesses that he did make them. By failing to ask him when he was first on the stand if he made the exclamations, and by calling him on rebuttal, plaintiff did not make him her witness.

8. ———: **Joint Tortfeasors: Verdict Against Part.** The petition may charge that the injury was the joint tort of several defendants, and the plaintiff may be nonsuited as to some of them and have judgment against the rest. Under the statute (Sec. 1734, R. S. 1909) plaintiff has the right to sue all the persons who are liable for the wrong he has suffered, or he may sue any one of them. The tort is several as to each tortfeasor, because each must and does act for himself, and each is liable for the full penalty of the wrongful act. [Disapproving Otrick v. Railroad, 154 Mo. App. 420, and Doster v. Railroad, —— Mo. App. ——.]

9. ———: **Contributory: Apprehending Danger.** Where the strongest evidence against the contractor's servant at work on the unfinished elevator shaft tends at most to show contributory negligence on his part, namely, that, while lying on the floor, it was negligence to project his head and shoulders into the shaft at a time when he might have apprehended the

operator of the elevator under the contractor's control might negligently cause the elevator to descend upon him, the court cannot say that as a matter of law he was guilty of such negligence as bars a recovery.

10. ————: **Imputable to Injured Party.** Where the servant of the contractor, at work on an unfinished elevator shaft, was killed by a descending elevator, testimony that he was instructed to do his work from the floor of the elevator, and that he disregarded that instruction and made arrangements with the elevator operator to warn him of the elevator's approach, and thereafter lying on the floor projected his head and arms into the shaft and did the work from there, is not alone sufficient to authorize the court to impute to the servant the negligence of the operator in lowering the elevator upon him without warning, where that testimony is contradicted by the witnesses who gave it, and by other witnesses who testified that no such instructions were given him, but that the operator after knowing that he was doing the work in that way and after notifying him on two previous trips, ran the elevator upon him without warning.

11. ————: **Choosing Dangerous Way: Master and Servant.** Where only one way for doing the work was furnished to the servant, the rule barring a recovery for choosing a dangerous way when a safe one was open, does not apply. Furthermore, where there are two ways in which a servant may do a particular thing, one dangerous and the other not so hazardous, both, however, furnished by the master, with the intention that the servant may at his discretion use either, it does not lie in the mouth of the master to say the servant cannot recover for his injuries because he chose the more hazardous.

12. **FAIR TRIAL: Undeserved Rebuke of Court.** Unjustified severity of admonition of appellant's counsel by the court during the process of a trial, if clearly not prejudicial, will not work a reversal.

Appeal from Jackson Circuit Court.—*Hon. J. G. Park, Judge.*

AFFIRMED.

*Warner, Dean, McLeod & Timmonds* and *H. M. Langworthy* for appellant Richmond Safety Gate Company.

(1) The court committed error in overruling the demurrer to the evidence interposed at the close of

plaintiff's case.   (2)   The court committed error in refusing to give to the jury the peremptory instruction at the close of the entire case.   (a) There was no evidence of negligence on the part of the Richmond Safety Gate Company.   Courter v. Mercantile Co., 136 Mo. App. 517; Ryan v. McCully, 123 Mo. 636; Gurly v. Railroad, 104 Mo. 223; Glasscock v. Dry Goods Co., 106 Mo. App. 657; Loehring v. Westlake Cons. Co., 118 Mo. App. 163; Nugent v. Milling Co., 131 Mo. 256; Smith v. Box Co., 193 Mo. 715; Mueller v. Shoe Co., 109 Mo. App. 506; Hirsch v. Bread Co., 150 Mo. App. 162.   (b)   Deceased was guilty of such contributory negligence as precludes recovery.   McCarty v. Hotel Co., 144 Mo. 397; Clancy v. Cons. Co., 50 N. Y. Supp. 800; Howell v. Iron & Steel Co., 98 Wis. 35; Darrow v. The Fair, 118 Ill. App. 665; Degnan v. Jordan, 164 Mass. 84; Murphy v. Webster, 151 Mass. 121; Fullwider v. Gas Co., 216 Mo. 582; McGahan v. Transit Co., 201 Mo. 500; Hurst v. Railroad, 163 Mo. 219; Dickey v. Dickey, 111 Mo. App. 304; Hirsch v. Bread Co., 150 Mo. App. 162; Pohlman v. Foundry Co., 123 Mo. App. 219; Whaley v. Coleman, 113 Mo. App. 594; Moore v. Railroad, 146 Mo. 572; Hurst v. Railroad, 163 Mo. 409; Matthews v. Railroad, 227 Mo. 241; Smith v. Box Co., 193 Mo. 715; Elevator Co. v. Carlson, 69 Ill. App. 212; Ward v. Connor, 182 Mass. 170; Laun v. Railroad, 216 Mo. 563; Degonia v. Railroad, 224 Mo. 564.   (c)   The negligence of the elevator operator will be imputed to deceased.   Abbitt v. Railroad, 150 Ind. 498; Jossaers v. Walker, 43 N. Y. Supp. 891; Hull v. Pool, 50 Atl. (Md.) 703; Stroher v. Elling, 97 N. Y. 102; Railroad v. Kistler, 66 Ohio St. 343.   (3)   The court committed error in giving plaintiff's instruction 1.   (a)   The instruction does not require the jury to find that the foreman of deceased knew that he was working in the elevator shaft with the car in operation. Bennett v. Lime Co., 146 Mo. App. 565; Wilks v. Railroad, 159 Mo. App. 722.   (b)   There is no presumption

of due care upon the part of deceased. Higgins v. Railroad, 197 Mo. 317; Stackburger v. Grand Lodge, 73 Mo. App. 38; Moberly v. Railroad, 98 Mo. 183. (c) The instruction does not submit the same cause of action as that stated in the petition. Otrich v. Railroad, 154 Mo. App. 420.

*Lathrop, Morrow, Fox & Moore* for appellant Montgomery Ward & Company.

(1)    Under all the evidence in this case there is no liability against this defendant: (a) 'deceased's negligence as a matter of law precludes recovery; (b) deceased's direction to the elevator operator as to how to run it made him assume the risk of the method suggested by him; (c) there was no breach of any of defendant's legal duties. Barney v. Railroad, 126 Mo. 392; Atherton v. Coal & Coke Co., 106 Mo. 592; Jossaers v. Walker, 43 N. Y. Supp. 891; Hall v. Poole, 50 Atl. (Md.) 703; Sherwood v. Warner, 27 App. D. C. 64. (2)    The court erred in compelling the witness Walker to demonstrate the loudness of the call made by the elevator operator when starting down on the trip on which the accident occurred. Sonoma County v. Stofen, 57 Pac. (Cal.) 681; Star v. People, 63 Pac. (Colo.) 299; Linehan v. State, 21 So. 502; State v. Hyde, 234 Mo. 256. (3)    Plaintiff's instruction number 2 was erroneous. Mokowik v. Railroad, 196 Mo. 571; Higgins v. Railroad, 197 Mo. 317; Adair v. Mette, 156 Mo. 496; Stackberger v. Grand Lodge, 73 Mo. App. 38; Moberly v. Railroad, 98 Mo. 183; Winters v. Supreme Lodge, 96 Mo. App. 1; Morton v. Heidorn, 135 Mo. 609; Ham v. Barrett, 28 Mo. 388; Rapp v. Railroad, 106 Mo. 423; Meyers v. City, 108 Mo. 480; Weller v. Railroad, 120 Mo. 635; Bluedorn v. Railroad, 121 Mo. 258; Schepers v. Railroad, 126 Mo. 665; Payne v. Railroad, 129 Mo. 405; Erhart v. Dietrich, 118 Mo.

418; Haycraft v. Grigsby, 88 Mo. App. 355; Lee v. Knapp, 55 Mo. App. 390. (4) The court committed prejudicial error in permitting plaintiff to call Pletz (the elevator man) as her witness and thereafter admitting the testimony of Fife, Cotter and Grace, for the purpose of impeaching him. Black v. Epstein, 221 Mo. 286; Brosius v. Lead & Zinc Co., 149 Mo. App. 181; Koenig v. Railroad, 173 Mo. 698; Barker v. Railroad, 126 Mo. 143; Rushenberg v. Railroad, 161 Mo. 70; Adams v. Railroad, 74 Mo. 553; Redmon v. Railroad, 185 Mo. 11; McDermott v. Railroad, 73 Mo. 516; Hamburger v. Rinkel, 164 Mo. 407; Roe v. Bank, 167 Mo. 406; Wojtlyate v. Coal Co., 188 Mo. 288.

*Bird & Pope* for respondent.

(1) The jury did not have to believe a witness even if his evidence is not contradicted. Rinehart v. Railroad, 204 Mo. 276; Porter v. Stock Yards, 213 Mo. 372; Gannon v. Gas Co., 145 Mo. 503; Gregory v. Chambers, 78 Mo. 298; Bradford v. Randolph, 45 Mo. 426; McAfee v. Ryan, 11 Mo. 364; Bryan v. Wear, 4 Mo. 106; Dunlap v. Chem. Wks., 159 Mo. App. 62. (2) The physical facts and exclamations of the elevator man right after the accident, where he kept repeating over and over that he had forgotten to stop at the sixth floor and call out to Hutchinson on this fatal trip like he had on the only trip before, in connection with the fact that he did stop on the only trip down before the fatal trip at the sixth floor and call out to Hutchinson and waited until he answered and got out of the shaft before he again started down, all negative any agreement between the elevator man and Hutchinson, as claimed by defendant. (3) The cases of Appel v. Eaton & Prince Co., 97 Mo. App. 428; Hughes v. Fagin, 46 Mo. App. 37, and Donovan v. Gay, 97 Mo. 440, announce the law as established by the great weight of authority in cases similar to the case

at bar, where construction or reconstruction work was going on in elevator shafts, and injuries resulted to workmen at work in said elevator shafts in doing the work of finishing the building and the elevator shaft, and the following are a few of the leading cases in other states on the proposition: Bank v. Hanks, 128 S. W. 14; Board v. Landers, 174 Ind. 460; Butler v. Lewman, 115 Ga. 752; Harmer v. Inv. Co., 68 N. J. L. 332; Schmitt v. Ins. Co., 43 N. Y. Supp. 318; Anderson v. Mill Co., 42 Minn. 424; Western Electric Co. v. Hanselman, 136 Fed. 564; Eckman v. Lauer, 67 Minn. 221; Worth Bros. v. Kallas, 162 Fed. 306. (4) It was the duty of defendant to provide a watchman, or to provide a system of warning or a reasonably safe system of protection for deceased. Koerner v. Car Co., 209 Mo. 141; Haley v. Railroad, 197 Mo. 24; DeWeese v. Min. Co., 128 Mo. 423; Rutledge v. Railroad, 110 Mo. 313; Schroeder v. Railroad, 108 Mo. 322; Reagan v. Railroad, 93 Mo. 352; Gaska v. Car Co., 127 Mo. App. 169; Nelson v. Railroad, 132 Mo. App. 695; Yongue v. Railroad, 133 Mo. App. 141; Mack v. Railroad, 123 Mo. App. 531; Claybaugh v. Railroad, 56 Mo. App. 635; Electric Co. v. Hanselman, 136 Fed. 564. (5) And in the absence of evidence to the contrary the deceased will be presumed to have been in the exercise of due care. Powers v. Transit Co., 202 Mo. 267; McGahan v. Transit Co., 201 Mo. 501; Eckhard v. Transit Co., 190 Mo. 613; Porter v. Stock Yards, 213 Mo. 372; Riska v. Railroad, 180 Mo. 187; Weller v. Railroad, 164 Mo. 198; Crumpley v. Railroad, 111 Mo. 152.

WOODSON, J.—The plaintiff instituted this suit against the defendants in the circuit court of Jackson county, to recover the sum of ten thousand dollars damages sustained by her for the alleged negligent killing of her husband on February 22, 1908.

The defendants F. E. Gloyd and A. M. Gloyd were partners doing business as the Gloyd Lumber

Company; Montgomery Ward & Company and the Richmond Safety Gate Company were corporations.

The deceased was injured in the building known as the "Gloyd Building," which was owned by the Gloyds, and the partnership was the original contractor, or builder of the building. The Richmond Safety Gate Company was a sub-contractor to furnish and install the fire gates; and Montgomery Ward & Company was the lessee of the building from the Gloyds, and was in possession thereof as their tenant. However, at the time of the injury the building was not fully completed; especially was that true in regard to the fire gates; they had not been fully installed.

A trial was had and the plaintiff recovered a judgment against both corporations, Montgomery Ward & Company and the Richmond Safety Gate Company, for the sum of $10,000, but the court sustained a demurrer to the evidence as to the Gloyds, which eliminated them from the case. After moving unsuccessfully for a new trial, the remaining defendants appealed the cause to this court.

The evidence for the respondent tended to show that she and Orlando W. Hutchinson, the deceased, were husband and wife, at the time of and prior to the date of the injury; that at the time of his death he was thirty-nine years of age, six feet tall and weighed one hundred and sixty-five pounds. That he was a sober, industrious man, and was a good, careful and attentive workman, a machinist, car repairer, and carpenter by occupation, and at the time of his injury was earning about three dollars a day as wages. That at his death he left surviving him his widow and two small children.

That he was an employee of defendant Richmond Safety Gate Company, the sub-contractor doing the work of installing the fire gates for F. E. and A. M. Gloyd, owners of the building in which deceased was injured; that he was placing safety gates or fire doors

in the elevator shaft near the center of the fifth floor of said building, which building was nine stories high and covered about a quarter of a block of ground.

That the appellant Montgomery Ward & Company was the tenant and lessee of said building and had been in charge of and in control of the same about twenty days prior to the injury; that the elevator had been in operation about ten days; also in charge and under the control of said company.

That the deceased went to work for appellant, Richmond Safety Gate Company, the day previous to his injury; that the first work he did was to hang doors, work on a stairway, and on an alcove on the fifth floor. That on the morning of the day of the injury, some ten or fifteen minutes prior thereto, his foreman, C. T. Thompson, put deceased to work in placing guide rollers on the wall, in the opening, of the elevator shaft on the fifth floor; that in order to place and hold the rollers in position it was necessary for him to drill or finish drilling one or more holes through the brick wall around the shaftway of the elevator, which was about fourteen inches in thickness, that the holes were some eight or ten inches above the level of the fifth floor of the building, and some six to ten inches back from the face of the doorway of the elevator; that the elevator doorway was in the north side of the elevator shaft, and said hole was east of the doorway or elevator opening, in the wall that formed the north wall of the elevator shaft.

Bolts were to be inserted in the holes after they were drilled, and nuts placed on each end thereof and screwed against a washer, for the purpose of holding the piece of iron to which the floor roller was fastened on the outside thereof, so that when the gate or door which ran across in front of the elevator was opened and came to said roller, on an incline or slopeway, and struck the roller and pressed it in shape, the gate or door would be pressed against the wall so as to make

it fit tight, and it would then connect with a latch on the other side of the wall, which held the gate tight and in place and in such a position that fire could not get in or out of the elevator shaft.

That some days previous to the date of the injury, other employees of the Richmond Safety Gate Company received orders from the foremen, McGee and Thompson, of the Richmond Safety Gate Company, to drill these holes into the wall of the elevator shaft on different floors, half way through from the outside of the shaft, and about eight inches into the wall, and then into the wall half way through from the inside of the shaft, until the holes from the opposite sides would meet in the center of the wall, and were thus completed. That the holes were drilled in that way for the reason that before such orders were issued the workmen had drilled the holes completely through from one side only, and thereby caused bricks to be loosened and fall, and thereby damaged the wall, and caused the bricks to fall down the elevator and to strike or jeopardize the lives and limbs of the workmen below.

That part of these holes were drilled before the elevator was started to be used. During that time planks were placed over or across the elevator shaft, and the men stood upon them while drilling; but after the elevator was put in operation, and the plank could no longer be used, the men asked the privilege of using the elevator to stand on while drilling on the inside of the shaft. That privilege was not granted and the only remaining thing they could do was to stoop in a cramped position on the knees, or to lie down on the floor, extend the head and arms into the shaft and reach around sixteen or eighteen inches and hold the drill with one hand and strike it with a hammer held in the other hand.

That the foreman of both Montgomery Ward & Company and the Richmond Safety Gate Company knew the men were doing the work in that manner, and that there was no other way furnished them by which they could do it after the scaffolding was removed from across the elevator shaft and the elevator placed in operation. That deceased did his work just as the other employees did theirs.

It took from twenty to thirty minutes to drill each hole. The drills were diamond or steel pointed, and were attached to steel bars sixteen to eighteen inches in length, and three-quarters of an inch in thickness, which cut a hole one inch in diameter. The hammers were double, heavy steel hammers, weighing from two and a half to four pounds, with a handle eight to twelve inches in length.

That prior to the time the deceased was directed to place these doors in position, the holes were supposed to have been drilled through the wall, but as a matter of fact, through inadvertence or oversight, some of the holes in the wall surrounding the shaft, including the hole on which deceased was working when injured, had not been drilled clear through, but only partially so from the outside.

That about fifteen minutes before the injury, deceased had been working on a vestibule sixty feet north of the elevator shaft, when he received orders from Thompson, his foreman, to go to the elevator shaft and place the rollers in position. That upon examination he found that this hole was only partially drilled, so he went to the tool room on the fourth floor, and told John Cotter, who was in charge of the same, that the hole was only drilled half way through, and asked him for a drill and hammer with which to finish the drilling. That he got the drill and returned to the fifth floor, to complete drilling the hole.

He took the same position to drill the hole that the other employees uniformly took when they drilled

the holes before mentioned after the elevator was put in operation, namely, stooped down on his knees and protruded his head and arms into the elevator shaft, or as some of the evidence tended to show, lay flat upon the floor, and protruded his head and arms into the shaft in the manner to be presently stated.

After working five or ten minutes thereat, he was struck and almost instantly killed by the elevator. The elevator was in charge of Frank P. Pletz, an employee of appellant Montgomery Ward & Company, and was being used constantly to haul freight and passengers.

That on and prior to the date of the accident, the building, as formerly stated, was in an unfinished condition, and was in a perfect state of confusion; the finishing work of the building was still going on. In all parts thereof, Montgomery Ward & Company were moving into the building their immense stock of goods and were making a great deal of noise by trucking in and unloading goods and boxes from wagons and trucks rolled over the floors and into the elevators, and by them being thrown upon the floors. That other general confusion and great noise was caused by workingmen moving around and hammering in the construction of the building, making shelving, boxing and doors, and by hammering on drills; also from driving nails all through the building, and by laying concrete and wooden floors; by putting in partitions, vestibules and fire doors and by lumber and material being hauled in the elevators; also by a number of employees working on the safety gates at the elevator shaft on the different floors, and by hammering on the tin on the wooden doors on the different elevator openings or doorways of the elevator shaft on the various floors, and from pounding bolts through said doors, by men working on the iron stairways and gates adjoining the elevator shaft, from plumbers and steam fitters hammering on iron pipes throughout the building

and while putting in toilet rooms near the elevator, and electricians working throughout the building and shaft.

Some of the witnesses testified that this confusion and noise was general throughout the building; and especially in and around the elevator shafts it was terrific and terrible. So great was it, that the workmen could not hear calls from one floor to another, unless they stood with their heads and bodies leaning partly into the shaft and listened attentively, and only then from one floor to another, and not from a distant floor.

That so great was the noise that the workmen had difficulty in giving and receiving orders, and it was almost impossible to hear anything spoken, and to do so they had to approach each other closely and tap each other on the arm or shoulder, and talk or halloo pretty loud to one another; otherwise, they would not be heard or understood. Especially was this true where the deceased was working, because of the concentration of the noise at that point, due to the openings from one floor to the others. That there were ten or twelve men working up and down, on or near the elevator shaft, on the different floors, pounding on the steel drills and safety gates and doors.

That the elevator doorways on each floor were about six feet high and were open and had no gates on them, only open grill work and crossbeams between the elevator and the adjoining one on the east, and both of them were running at the same time. There were a number of these elevators, the exact number not stated, located close to each other, which were being worked upon and operated at the time of the injury. They faced in all directions.

The elevators were run by electricity and were practically noiseless (the only noiseless thing about the building), and had been in operation several weeks before the injury occurred.

That at the time of the injury some of the evidence tended to show that the deceased was lying down on the floor with his head and arms extending into the elevator shaft, and that he was reaching around, drilling the hole, as before stated, while other portions of the testimony tended to show that he was kneeling down, protruding his head and arms into the shaft, and was drilling the hole as previously stated.

That after Hutchinson began work there, the elevator had made but one round trip before it struck and killed him. It was on the second trip that he was killed.

That on the first trip, Pletz, the elevator man, when descending from the ninth floor, stopped the elevator at the sixth floor, just above where Hutchinson was working, and called, "Look out below," that he was coming down; that he held the elevator there a minute or more until Hutchinson answered, "All right," then he started down with the elevator. That after reaching the ground floor, Pletz started upward, and stopped at the fourth floor, or the one below the one on which deceased was working. Hutchinson evidently saw the elevator approaching and moved out from the shaft, and the elevator proceeded upward to the ninth floor. That after stopping a few minutes on the ninth floor, and while the elevator was standing, Pletz called out, "Going down," as some of the witnesses testified, or "Look out below," as others said. That he then started the elevator downward, but so great was the noise that Hutchinson could not have heard the call made on the ninth floor, nor did any other workman in the building hear that call, except one or two, and they were working at the elevator door on the ninth floor, where the call was made, and within a few feet of Pletz.

That on this, the second trip downward, which was the fatal one, Pletz did not stop the elevator at the sixth floor, as he had done on the first downward trip

just previous, nor did he give any warning whatever to deceased or anyone else of his approach or descent after starting from the ninth floor. That this, the fatal trip, was continuous from the ninth to the fifth floor, where Hutchinson was killed, who at the time was busy at his work drilling the hole on the inside wall of the elevator shaft, in the position before stated.

That the elevator struck and killed him almost instantly. It mashed and crushed his head and shoulders, as well as broke and crushed his arms.

That immediately after the accident, several of the workmen examined the situation and found that the drill was still in the hole, on the inside of the shaft, bent in an "L-shape," and they observed that the hole was not then drilled completely through; it lacked some inches.

That while the body of the deceased was still pinioned beneath the elevator, Pletz stated to several of the men working there that on the previous trip he stopped the elevator at the sixth floor in descending, and at the fourth floor in ascending, and on each occasion called to deceased to look out for the elevator, and remained stationary until he received an answer, "All right," or words to that effect; also that as he left the elevator and started down the stairs, he exclaimed, "Oh Christ, I forgot to call at the sixth floor," and, "Oh Christ, if I had stopped this time," or, "Oh Christ; if I had stopped this time I would not have killed him."

The appellant's evidence varies but little from that of the respondent, except in the following particulars:

That Hutchinson, the deceased, when put to work in attaching the rollers to the wall of the elevator shaft was told by his foreman that the work was dangerous, who instructed him that if it became necessary for him to work in the shaftway, he should stop the car and work from it. That the elevator operator when he first

saw Hutchinson working near the entrance to the elevator, stopped his car and at Hutchinson's request permitted him to use it for a minute and then told him that if he had to work inside of the shaft to let him know and he would stop the car for him. That Hutchinson replied that it would not be necessary, but that if the operator would call out whenever he started to move the car up or down, that would be sufficient.

That before the accident occurred the foreman of the work warned Hutchinson the second time not to work inside the shaft while the car was in operation.

That prior to going to work for the Richmond Safety Gate Company, Hutchinson had been doing some carpenter work in the building and was perfectly familiar with the conditions therein and thereabout.

That all the drilling which had been done, prior to the injury, on the inside of the elevator shaft, had been done by erecting scaffolds across the shaftways.

That the holes for the bolts were supposed to have been previously drilled, and the foreman instructed Hutchinson to insert the bolts, screw on the rollers and hang the fire doors. That at the time he showed deceased how to do the work he told him that when he was ready to put the bolt in, to stop the car for that purpose, and to work from the car, and not to work from the inside of the shaft without stopping the car.

That shortly after he began work, the elevator operator stopped the car at the fifth floor, and at Hutchinson's request permitted him to use the car in order to attempt to put in the bolt. The bolt would not go through the hole, and thereupon the operator told him that if he was going to work in the shaft, to let him (the operator) know and he would stop the car and let him use it; and that he would place it anywhere he wanted it. That Hutchinson replied that it was not necessary to stop the car, but that if the operator would shout a warning when he was about to de-

scend or ascend, he, Hutchinson, would get out of the way. That shortly after this conversation took place, Thompson, the foreman of Montgomery Ward & Company, boarded the car on the first floor and the elevator operator told him that there was a man working on the fifth floor, and had refused to use the elevator; whereupon Thompson, who had then reached the fourth floor, shouted to Hutchinson, telling him not to take any chances, that if he wanted the elevator, to stop it long enough to put the bolt in, and Hutchinson replied that he would do so. A few minutes after this conversation occurred, the elevator descended and struck and killed Hutchinson.

That the elevator operator did not know that Hutchinson was in a place of danger while the elevator was descending, until the car was within two feet of him, nor could he see him until about that time, which was too late to stop the car.

There was evidence for the respondent, tending to contradict all the evidence introduced for the appellants.

There are special features of the evidence which will be more specifically stated and considered in the course of the opinion.

At the close of the respondent's evidence, the defendants F. E. and A. M. Gloyd requested, and the court gave to the jury, an instruction in the nature of a demurrer to the evidence. The giving of this instruction eliminated the Gloyds from the case, and there was no appeal as to them.

Also, at the close of the entire case, each of the appellants asked an instruction in the nature of a demurrer to the evidence, which the court refused; and at the close of all the evidence in the case each of the appellants asked a peremptory instruction telling the jury to find for them, which the court also refused.

Thereupon counsel for the respondent asked, and the court, over the objection of the appellants, gave to the jury the following instructions:

"1. If you find and believe from the evidence that the plaintiff, Mary Hutchinson, is the widow of Orlando W. Hutchinson, deceased; that on or about February 22, 1908, and at about the hour of 11:35 a. m. on said day, said deceased was in the employ of the defendant, Richmond Safety Gate Company, and was placing a safety gate on a doorway on the fifth floor of a passenger elevator in the Gloyd Building, corner of Nineteenth and Campbell streets, in Kansas City, Missouri, and was drilling a hole through a brick wall about one foot above the fifth floor landing at the doorway of said elevator for the purpose of attaching a guide roller of the safety gate; that in order to drill said hole into said wall the said deceased was compelled to place part of his body in the shaftway of said elevator, and that said defendant, Richmond Safety Gate Company knew, or by the exercise of ordinary care should have known, that said deceased was required to place part of his body in the shaftway of said elevator, in doing said work; that while said deceased was so engaged in drilling said hole the operator of said elevator carelessly and negligently ran said elevator down said shaftway and against the said deceased, without warning him of the approach of said elevator, and so crushed, bruised and injured him that he died on the same day as the result of said injuries; and if you further find and believe from the evidence that said defendant, Richmond Safety Gate Company, carelessly and negligently failed to provide plaintiff with a reasonably safe place to do his said work, and that it carelessly and negligently failed to provide a reasonably safe system of protection for the purpose of warning the deceased when said elevator was about to go up or down and past said fifth floor, and carelessly and negligently failed to provide means to give him

warning of the approach of said elevator up and down and past said fifth floor, and that a reasonably prudent person under the same or similar circumstances would have done so, and if you further find and believe from the evidence that the death of the deceased was caused by such neglect (if any) of said defendant Richmond Safety Gate Company, and if you further find and believe from the evidence that at the time he was so injured the deceased exercised the care of an ordinarily prudent person, under the same or similar circumstances, then you will find for the plaintiff, and against the defendant, Richmond Safety Gate Company, and assess her damages (if any) at such sum, not exceeding the sum of $10,000, as you may deem fair and just, in view of all the evidence, and with reference to the necessary pecuniary injury (if any) resulting from such death to the plaintiff.

"And you are further instructed that if you find no evidence or circumstances to the contrary, you may assume that the deceased at the time he was injured, was in the exercise of ordinary care.

"By 'ordinary care' is meant that degree of care and caution usually exercised by reasonably prudent persons under the same circumstances.

"By 'negligence,' 'negligent' and 'negligently' is meant the failure to exercise ordinary care.

"2. If you find and believe from the evidence that the plaintiff, Mary Hutchinson, is the widow of Orlando W. Hutchinson, deceased; that on or about February 22, 1908, and at about the hour of 11:35 a. m. on said day, said deceased was in the employ of the Richmond Safety Gate Company, and was placing a safety gate on a doorway on the fifth floor of a passenger elevator in the Gloyd Building, corner of Nineteenth and Campbell streets, in Kansas City, Missouri, and was drilling a hole through a brick wall about one foot above the fifth floor landing at the doorway of said elevator for the purpose of attaching a guide roll-

er of a safety gate; that in order to drill said hole into said wall the said deceased was compelled to place part of his body in the shaftway of said elevator, and that said defendant Montgomery Ward & Company knew, or by the exercise of ordinary care should have known, that said deceased was required to place part of his body in the shaftway of said elevator, in doing said work; that while said deceased was so engaged in drilling said hole the operator of said elevator carelessly and negligently ran said elevator down said shaftway and against the said deceased, without warning him of the approach of said elevator, and so crushed, bruised and injured him that he died on the same day as the result of said injuries; and if you further find and believe from the evidence that said elevator was there and then under the management and control of the defendant, Montgomery Ward & Company, and was at the time being run by an employee of said Montgomery Ward & Company, and that the operator of said elevator knew, or by the exercise of ordinary care should have known that said deceased was working in said shaftway, in time to have avoided injuring said Hutchinson, and if you further find and believe from the evidence that the death of said Orlando W. Hutchinson was caused by the carelessness and negligence of the operator of said elevator in carelessly and negligently running said elevator down said shaftway and upon the said deceased, without warning him of the approach of said elevator, and that at the time he was injured the deceased exercised the care of an ordinarily prudent person, under the same or similar circumstances, then you will find for the plaintiff and against defendant Montgomery Ward & Company, and assess her damages at such sum, not exceeding the sum of $10,000, as you may deem fair and just, in view of all the evidence, and with reference to the necessary pecuniary injury (if any) resulting from such death to the plaintiff.

"And you are further instructed that if you find no evidence or circumstances to the contrary, you may assume that the deceased, at the time he was injured, was in the exercise of ordinary care.

"3. You are instructed that a risk and danger attending the work of deceased and arising from or caused by the neglect (if any) of the defendant Richmond Safety Gate Company, was not an ordinary risk of his employment, which he assumed.

"4. The burden of proof is upon the defendant, Montgomery Ward & Company, to show that the death of Orlando W. Hutchinson was caused by his own carelessness and negligence directly contributing thereto, and it must establish such fact by a fair preponderance of all of the evidence in the case.

"5. If you believe that any witness has wilfully testified falsely to any material fact, then you are at liberty to disregard the whole or any part of the testimony of such witness."

Counsel for appellant Richmond Safety Gate Company asked the court to give, in its behalf, eleven instructions numbered from 4 to 15 inclusive, all of which the court gave, except the 14th, which over its objection the court modified, and gave it in the modified form. Counsel for said appellant also requested the court to give to the jury instructions designated by the letters "F," "G" and "K." Since, however, no point is made in briefs by counsel regarding this action of the court, we will notice the objection no further.

At the request of counsel for Montgomery Ward & Company the court gave to the jury instructions numbered 17, 18 and 20, but refused to give as asked instructions numbered 16 and 19 also requested by them, but modified them and gave them in the modified form. But no complaint is made of this action of the court, in the briefs filed in this court; consequently, we will disregard the objection. Counsel for Montgomery Ward & Company also requested the court to

give instructions designated by the letters "H," "I" and "J," which were refused, but no complaint is here made of that action of the court, so we disregard them.

Objections were made and saved to the giving and refusing of all instructions.

I. We will first consider the Montgomery Ward & Company branch of the case; and in passing will state that for convenience and because of the condition of the record as to the evidence we will consider certain questions and certain elements of other questions presented under this branch of the case, which are common to both branches of the case, under the branch relating to the Richmond Safety Gate Company; and for the same reasons there are certain other questions presented under the Richmond Safety Gate Company branch which will be considered under this branch of the case.

Counsel insists that: "Under all the evidence in the case there is no liability against this defendant: (a) deceased's negligence as a matter of law precludes recovery; (b) deceased's direction to the elevator operator as to how to run it made him assume the risk of the method suggested by him; (1) there was no breach of any of defendant's legal rights."

Because of the interwoven and close relation that exists between these three propositions, we will consider all of them together.

The insistence that the deceased's negligence in this case, as a matter of law, should preclude a recovery, is in our opinion not well founded.

Concede, for the present, that Hutchinson was not a passenger upon the elevator, and not intending to become such, nor an employee of this appellant, and that, therefore, the laws governing passenger and carrier, and master and servant, have no application, nevertheless, he was rightfully in the building, and was

acting within the scope of his employment, namely; placing fire rollers on the inner wall of the elevator shaft; and according to respondent's evidence, the deceased was placed at the elevator shaft, to do the work in the same manner that the other employees had been doing it, that is, by kneeling or lying on the floor of the building and protruding his head and arms into or through the opening of the elevator shaft, and reaching around to the place where the bolts and rollers were to be inserted and fastened.

There was nothing necessarily dangerous in that mode of doing the work assigned to him, certainly not so obvious and apparent as to have threatened such imminent danger that no person of ordinary prudence and caution would have done it.

The danger that existed, if any, was not attributable to him nor incident to the mode of doing the work, but to the wanton or negligent conduct of the parties who had charge of the elevator, and who controlled its operation, one of whom, confessedly was Montgomery Ward & Company. This is made apparent by the fact that numerous other employees performed the same work under the same conditions without objection or protest, and without injury of any kind to any of them.

This court has repeatedly held, and properly so, in our opinion, that the danger arising from the wanton or negligent conduct of another, is not a risk assumed by an employee; also that he is not required to presume that they will be negligent. [George v. St. Louis & San Francisco Railroad Co., 225 Mo. 364, l. c. 405.] This case cites and reviews practically all the cases in this court bearing upon that question, and especially the case of Charlton v. Railroad, 200 Mo. 413, written by LAMM, J., which is the ablest discussion of the question I have been able to find. I can add nothing of importance to what has been written in those two cases.

The record in this case abounds in evidence tending to show that both of the appellants were guilty of negligence, which caused the injury and death of Hutchinson. That evidence will be more particularly referred to later in the opinion.

If we assume, as counsel for this appellant has, that Hutchinson controlled the elevator man, and directed his movements, as well as the operation of the elevator car, then there would be great force in their insistence that respondent is not entitled to a recovery. But unfortunately for their client, there is substantial evidence preserved in this record which tends to show that Hutchinson had no control whatever over the elevator or its operator, but upon the contrary, Pletz, the elevator man, was under the control of both of the appellants, through their respective foremen, Thompson and Walker. Not only did the evidence tend to show that they had charge of the operation of the elevator, but also that both of them, as well as the operator himself, knew the position deceased occupied and which he had to occupy, according to respondent's evidence, while doing this work. Thereupon, the foreman of Richmond Safety Gate Company placed Hutchinson there to do the work he was engaged in at the time he was killed. In addition the elevator man said to him (Thompson), "One of your men [Hutchinson] is working up there in the hatchway, and he refuses to use the elevator. I wish you would speak to him, because I don't want to hurt anybody." Thereupon Thompson testified that he went to the fifth floor, where Hutchinson was working, and told him that he must be careful and not get hurt as it was dangerous there; also told him to insert the bolts from the elevator; that he then passed on to the ninth floor and Hutchinson continued to drill the hole as he had been doing before.

W. P. Walker, the manager of Montgomery Ward & Company, testified that he was on the elevator at the time it struck and killed Hutchinson, and that the

elevator man, when he started down from the ninth floor, hallooed "going down" in a loud voice, as he always did. That was his habit, "as I had repeatedly instructed him to do." He also testified that he had repeatedly told the elevator man to be on the lookout for men working in the shaft, and to give them warning of the approaching elevator. That he had given this order before Hutchinson was killed; also that he went up on the elevator the last trip it made before it struck Hutchinson, and saw him kneeling down at work on the fifth floor. That he went on to the ninth floor in the elevator and right down again, and was in the elevator when it struck and killed Hutchinson.

As previously stated this evidence not only shows conclusively that all three of them, Pletz, the elevator man, Thompson, foreman of the Richmond Safety Gate Company, and Walker, the manager of Montgomery Ward & Company, knew the position that Hutchinson was in at the time of and prior to the time of his death; but also that they were using and had the management and control of the elevator and its movements.

This evidence is corroborated by that of the respondent upon the same matters. In fact, I do not understand counsel for this appellant to seriously controvert those facts, but they seek to escape the legal effect thereof by interposing the rule of law announced by this court in the case of Barney v. Railroad, 126 Mo. 372, l. c. 392. That is, notwithstanding the fact that this appellant did give orders and directions to the elevator operator, to be careful and give warnings of the approach of the elevator to the workmen in the building, so as not to injure them, still the neglect of that duty would not make Montgomery Ward & Company liable for the deceased's injuries, for the reason that it owed him no legal duty, and the mere fact that they voluntarily assumed the duty to warn deceased and others of the approaching danger, the negligent

failure to discharge that assumed duty would not render them liable for the injury.

The rule in the Barney case, supra, is expressed in this language: "But plaintiff's counsel says that defendant assumed the duty of keeping its yards clear of boys, by giving instructions to its yard hands, etc.; but that this duty was neglected and therefore a cause of action arises alone from this neglect. But if the prior duty did not exist to keep the boys out of the yards, then the mere assumption of a nonexistent duty, would be but a gratuity with no precedent or concurrent consideration on which to base it, and therefore no liability would follow such assumed and pretermitted duty. Mere pretermission of a self-imposed precaution does not constitute actionable negligence. [Skelton v. Railroad, L. R. 2 C. P. 636; Campbell on Negligence (2 Ed.), sec. 41.]"

We have no criticism to offer to that rule, but it has no application to the facts of this case. There, Barney was a trespasser and had no legal or moral right to be upon the premises of the railroad company where he was injured, but prompted by a humane spirit, and as an extra precaution against liability for injuries done, the company assumed the duty, or more accurately speaking, the right or authority to exclude boys and other trespassers from its yards and cars. But that is not this case. Here, Hutchinson was lawfully upon the premises, being an employee of the Richmond Safety Gate Company, a subcontractor, and actually engaged in the performance of his duties at the very time he was injured; and both of the appellants were using the elevator at the time, which was under the care and control of each of them, through their respective foremen, as previously shown, and both, or probably more correctly speaking, Montgomery Ward & Company, the lessee of the building, was in possession and had charge and control thereof, in-

cluding the elevator and shaft, under and by virtue of the lease; and the Richmond Safety Gate Company, being a subcontractor to put the fire gates in position, by necessary implication had the legal right to employ and take into said building all employees necessary to do that work. That being true, each of them owed Hutchinson the duty to use all reasonable care to prevent injury to him. [Clark v. Railroad, 234 Mo. 396.]

The mere fact that deceased was not an employee of Montgomery Ward & Company did in no manner excuse or lessen the degree of care it owed him, for the reason that the contract subletting the work of putting in the fire gates to the Richmond Safety Gate Company was an implied invitation or license by the owners, contractors and lessors, F. E. and A. M. Gloyd and the Gloyd Llumber Company (who were one and the same person), of the building to the Richmond Company to take into the building all employees necessary to do that work; and the taking possession of the building by the lessee, Montgomery Ward & Company, under and by virtue of the lease, before the building was completed, was an adoption or assumption by it of the invitation extended by the Gloyds, the owners, contractors and lessors of the building, to the subcontractor to take into the building all employees necessary to construct the fire gates. In other words, when Montgomery Ward & Company, the lessee of the building, took possession of it, under and by virtue of the lease, before it was completed, it thereby ratified, assumed and adopted, as its own, the invitation extended to Richmond Safety Gate Company to take into the building all employees who were necessary to complete putting in the fire gates, and consequently it assumed the duties the owner or lessor owed said employees, and is as much bound thereby as if the original invitation had been made and extended by it in the first instance to Richmond Safety Gate Company, the subcontractor. This is based upon the elementary principle that both

the contractor and subcontractor are respectively liable to their employees, and to each other's employees where they have negligently injured them. [Clark v. Iron & Foundry Co., 234 Mo. 436, and cases cited.]

The conclusions announced must necessarily result in our holding that none of the three reasons urged in support of the demurrer to the evidence are well taken, and we are, therefore, of the opinion that the court properly refused the demurrer.

II. It is next insisted by counsel for appellant Montgomery Ward & Company that the court erred "in compelling witness Walker to give a demonstration" as to the loudness of the call made by the elevator operator as a warning given when starting the elevator down from the ninth floor, on the trip on which the accident occurred.

At the trial in the circuit court, appellant sought to escape liability by showing that the elevator man warned Hutchinson of the approach of the elevator by calling out on the ninth floor, as he started down, "Look out below," or words to that effect.

In order to have been a warning the words should have been spoken loud enough for Hutchinson to have heard them had he been exercising care.

The evidence for the respondent which was not contradicted by that of the appellants, tended to show that the confusion and noise throughout the building, and especially about the elevator shaft, was "terrible and terrific," so great that no person could be heard to speak from one floor to another, nor on the same floor, except where the parties stood close together, and only then when the attention was attracted by a tap on the arm or shoulder.

Under this state of facts it became very important for the jury to know with what degree of loudness the elevator operator uttered the words of warning that were designed for the descent.

It is common knowledge and observation that a person may speak in a low tone of voice or in an ordinary tone or in a high tone, also that he may halloo at the top of his voice. It is also well known that different persons have different voices and that they vary in strength and penetration. That being true, it is perfectly obvious that a repetition of the words of the elevator man, by the witness, in the same tone and degree of loudness that he spoke them, would be of more assistance to the jury in finding whether or not Hutchinson heard or could have heard them, than if the witness had simply testified that the elevator man called out, "Look out below." In other words, the jury could have better understood the degree of loudness of the words in which they were spoken by the elevator man, by hearing the witness repeat them in the same degree and tone of voice than they could have done by simply hearing him state in an abstract manner that the elevator man had called out, "Look out below."

But, be that as it may, counsel have not suggested in what way such demonstration did or could have injured appellant. If pressed too far it might have had the effect of holding the witness up to ridicule, especially if he was not a good actor or imitator; however, that would largely concern the witness and not the litigant; but in the case at bar the matter was not pressed to that point, and we cannot believe any court in this State would tolerate any witness to be so treated at the hands of counsel.

There was no error in the admission of this evidence.

The authorities cited do not in our opinion apply to this class of testimony; and judging from the following italicized words found in counsel's brief upon that point, we judge they attach but little merit to the objection, viz.: *"In any event, we think this theatrical display was improper."*

Under Sec. 2082, R. S. 1909, we have no authority to reverse a judgment simply because some improper thing occurred during the trial of a cause, without it manifestly appears that such impropriety injuriously affects the complaining party.

III. Counsel for appellant challenges the correctness of instruction numbered two, given on behalf of the respondent, for two reasons: first, because there was no evidence introduced tending to show that the elevator man knew, or by the exercise of ordinary care might have known, that the deceased was working in the shaft in time to have avoided injuring him, and, therefore, there was no evidence upon which to base that part of the instruction which told the jury, among other things, that if ''the said defendant, Montgomery Ward & Company, knew or by the exercise of ordinary care should have known that said deceased was required to place part of his body in the shaftway of said elevator in doing said work,'' etc; and, second, because the last paragraph of the instruction erroneously injects into the case a presumption in favor of the respondent.

We will consider these objections in the order stated.

As to the first: We are of the opinion that this objection is not well grounded, for the reasons stated in paragraph one of the opinion. There we called attention to the particular evidence which indisputably shows not only that Montgomery Ward & Company could have seen Hutchinson in a place of danger in time to have avoided injuring him, but that it had actual knowledge thereof through Walker, its manager, and Pletz, the elevator man, who was in the company's employ. And if that were not true, why did Walker testify that Pletz while on the ninth floor called out, ''Look out below?'' This of itself shows that Walker

knew that he or some other employee was there. He also testified that he saw Hutchinson just a minute or so before he was killed kneeling down at the entrance of the shaft trying to insert the bolts, and that he called to him to be careful; also that he went to the ninth floor, leaving Hutchinson still kneeling there, and after reaching the ninth, Pletz called out, "Look out below," and instantly they started down, and without a stop or additional warning the elevator struck and killed Hutchinson. And it cannot be said that Walker did not hear Pletz make the call, for it was about those words that he was called upon to "demonstrate," or to repeat to the jury in the trial of the cause, and which constituted the grounds of the objection considered in paragraph two of the opinion.

But independent of all that, the respondent's evidence tended to show that Hutchinson was by the subcontractor, Richmond Safety Gate Company, required to do the work in the manner he was doing it when injured. That being true, and it also being true that Montgomery Ward & Company entered into and took possession of the building, elevator and shaft under its lease before the building was completed, and operated the elevator, and recognized and by silence, at least, acquiesced in Richmond Safety Gate Company the subcontractor's continuation of the work of putting in the fire gates which were for their use and benefit, this appellant thereby assumed the duties and obligations originally resting upon the Gloyds, the owners, builders and lessors and upon Richmond Safety Gate Company, the subcontractor, to furnish their employees with a reasonably safe place to work or to notify them of any approaching danger known to them, the contractor and subcontractor, and not known to them, the employees. [See Clark cases, supra.]

We are, therefore, of the opinion that this challenge is not well grounded.

The second objection urged against this instruction regards the last clause thereof, which reads as follows:

"You are further instructed, if you find no evidence or circumstances to the contrary, you may assume that the deceased at the time he was injured was in the exercise of ordinary care."

Counsel insist that there is no room in this case for a presumption, that is, since there were eye witnesses who testified to the entire accident, the jury should have been instructed to find from the evidence and not from presumptions.

It is a well-settled rule of evidence in this State, that it is erroneous to instruct the jury that they may presume a certain thing to be true or that a certain condition existed when evidence in the case tends to prove or disprove that thing or condition. The cases so holding are numerous. [Mockowik v. Railroad, 196 Mo. 571; Higgins v. Railroad, 197 Mo. 317; Adair v. Mette, 156 Mo. 496; Moberly v. Railroad, 98 Mo. 183.]

Counsel for respondent insist that the clause objected to does not subject the instruction to the vice complained of.

By reading that clause of the instruction it will be seen that it does not tell the jury that they may presume that Hutchinson was in the exercise of ordinary care, at the time he was injured, but upon the contrary it told the jury that if they found "no evidence or circumstances to the contrary," then they might assume that he was exercising ordinary care when injured. In other words it told the jury that if they found from the evidence that deceased was not guilty of negligence, then they might assume he was exercising ordinary care, for the words "to the contrary," used in the instruction, refer to the word "negligence" understood, and if the deceased was not guilty of negligence then he was exercising ordinary care, and it

was not error for the court to tell the jury that in such case they might assume that he was exercising ordinary care.

This is the plain grammatical construction of the clause, and it also gives to the words thereof their ordinary and usual meaning.

We are, therefore, of the opinion that the instruction is not vulnerable to objections urged against it.

IV. It is next insisted by counsel for Montgomery Ward & Company that the court erred in permitting the respondent to call in rebuttal F. T. Pletz, the elevator man, and ask him certain questions; among others: If he made the exclamations, "Oh Christ, I forgot to call on the sixth floor;" "Oh Christ! If I had only stopped this time," heretofore set out in the statement of the case, and then call certain other witnesses who are allowed to impeach him.

It will be observed that the competency and relevancy of Pletz's exclamations were not questioned, but the complaint is that counsel for respondent, by recalling him in rebuttal (he having previously testified for appellants in chief) made him a witness for the respondent, and that it was error to impeach him, their own witness.

This insistence is untenable for the reason that whenever a party to a suit introduces a witness in a cause, he is, under the laws of this State, the witness of that party for all purposes throughout the case. This is elementary and needs the citation of no authority to support it.

If the witness had been examined regarding those exclamations while on the witness stand in chief, it could not now be contended that it would have been error to have impeached him; but because of the inadvertence or through oversight of counsel, he was not so examined then, it is contended that respondent lost her right to recall and impeach him.

There is no law in this State lending countenance to that contention. Black v. Epstein, 221 Mo. 286, and Brosius v. Sunflower Lead & Zinc Co., 149 Mo. App. 181, cited by counsel, are not in point.

V. Counsel for this appellant insists that the petition was predicated upon and charged that the injury complained of was the result of the joint tort of F. E. Gloyd, A. M. Gloyd, the Gloyd Lumber Company, Montgomery Ward & Company and the Richmond Safety Gate Company, while the evidence and judgment show that the injury was caused by the negligence of Montgomery Ward & Company and the Richmond Safety Gate Company alone. This, it is insisted, is a departure between the petition and the evidence and for that reason the respondent was not entitled to a recovery. In other words, the respondent charged a joint tort against all the defendants, and before she can recover she must show that the injury was the result of the joint wrong of all of said parties.

No authority is cited in support of this insistence; but by an examination of the briefs filed by counsel for the Richmond Safety Gate Company, we find the same contention is made in that branch of the case, and in support thereof we are cited to the cases of Otrich v. Railroad, 154 Mo. App. 420, and Doster v. Missouri Pacific Railway Co., —— Mo. App. ——.

The former case was a suit brought by the plaintiff against the St. Louis, Iron Mountain & Southern Railway Company and the St. Louis Southwestern Railway Company for damages sustained for injury done to live stock shipped from McClure, Ill., to Clarendon, Arkansas, via Illmo, Missouri. The former road carried the stock to Illmo and the latter carried it from Illmo to Clarendon. The ordinary bills of lading were issued by the first or receiving carrier to the plaintiff. The petition undertook to state what specific acts of negligence each company was guilty of, and in

a general way what injury each did to the stock, but wound up by stating: "Plaintiff states that he is unable to determine the exact amount of liability to be attached to each defendant on account of said defendants being so closely connected in their business arrangements and on account of them having the same agent and jointly using the same yards at said point, Illmo, Mo., where the greatest damage was discovered; that both defendants were guilty of gross negligence and misconduct in handling said consignment of live stock."

The plaintiff introduced evidence showing that each company issued a separate bill of lading, and that the St. Louis, Iron Mountain & Southern Railroad Company was guilty of negligence which resulted in injury to the stock shipped, but there was a total failure of evidence showing the St. Louis Southwestern Railway Company was guilty of any negligence whatever. The judgment was for plaintiff for $400, against both defendants.

Upon that state of the record the Court of Appeals held that there could not be a recovery against either defendant; and in discussing that question Nixon, J., on page 430, in speaking for the court, used this language: "This case, as is seen, is based on a joint tort, and the cause of action cannot be supported by proof of a cause of action founded on separate torts of the alleged joint tortfeasors, but it is indispensible in order to sustain the joint action that there must have been such concurrent action between the defendants as to create a joint liability. In such case the difference between the allegations and the proof is not to be regarded as a mere variance, which is cured by verdict under the statute, but is a total failure of proof when the defect is raised as provided by statute. Consequently, in order for plaintiff to sustain his action against both defendants it became necessary for him

to show by evidence that he had a joint cause of action against the defendants.''

In pursuance to that ruling the court rendered the following order or judgment: ''The evidence wholly fails to sustain the allegation of negligence on the part of the defendant Southwestern Railway and the judgment as to said company is reversed. The judgment as to the defendant Iron Mountain Railway is reversed and the cause remanded. All concur.'' In support' of that ruling the court cited the cases of Meyers v. Railway, 120 Mo. App. l. c. 292.

As regards the latter,. or the Doster case: We know nothing except what counsel in their brief say about it, which is as follows: ''Doster v. Mo. Pac. Ry. (Recently decided by Kansas City Court of Appeals, but not yet reported.)'' Then follows a quotation therefrom which will be presently noted. We have examined the advance sheets of the Southwestern Reporter down to date, but find no mention of the case, consequently we do not know what the facts of that case are, nor upon what authority it is predicated.

The quotation before mentioned, taken from the Doster case, is as follows:

''Defendant insists that the cause of action alleged to be a joint act of negligence committed by the two roads, and the proof showing only a single act of negligence by the one road, and the cause submitted as single negligence, the judgment cannot stand. We are satisfied the objection is well taken. It is true that by our statute (Sec. 1734, R. S. 1909), any one who has a cause of action against several and is entitled to but one satisfaction, 'may bring suit thereon jointly against all or as many of the persons liable as he may think proper.' But that statute does not mean that you may sue on a joint cause of action and recover on a single cause of action. If the cause of action charged is joint, the proof must show a wrong jointly committed, though the judgment may be had

against one only, if the plaintiff so elects. If several are joined in one action for a joint tort and the proof fails to connect some, there may be a dismissal as to them and a recovery had against whoever remains, but such recovery must be on a tort committed by more than one. For if a joint wrong is alleged, and the proof is of a single or separate tort by one, or of separate torts by different ones, the action cannot be sustained.''

In the case of Otrich v. Railroad, supra, it will be seen that both railroad companies were sued for a ''joint tort'' as the court termed it. The evidence showed that the Southwestern Railway Company was guilty of no negligence whatever, and the court, properly, for that reason, reversed the judgment as to it. The court also reversed the judgment against the Iron Mountain for the reason before stated, that the suit was for a joint tort and the plaintiff could not recover for a separate wrong done by the latter.

This ruling as before stated is based upon the authority of Meyers v. Railroad, supra. Upon an examination of that case, we find it is based upon the case of Bagnell Timber Co. v. Railroad, 180 Mo. 420.

The latter case in effect held that in order to maintain a suit against any of the defendants, in a suit where the petition declared upon a joint contract, the evidence must sustain the allegation that the contract was joint between all the defendants, and that a failure of proof as to one or more of them destroyed the right of recovery against the remaining defendants also, notwithstanding their confessed liability under the contract. That case came before this court again, on a second appeal, and we were requested to reconsider the ruling previously mentioned. That case is reported in 242 Mo. 11. That request was granted and upon a reconsideration of the question the court on page 19 used this language:

"We will now consider the second proposition presented for our determination, namely, what is the character of the contract sued on, as stated in the petition? This court on the former appeal clearly held that the contract as pleaded was a joint contract made and entered into by and between the plaintiff, the one party, and the railway company and Graham & Miller, the other party, and then reversed the judgment because the evidence did not support the allegations of the petition, in that it failed to show that Graham & Miller entered into the contract jointly with said company. Conceding that at common law the contract as stated in the petition was a joint one, as was held on the former appeal, yet under the express provisions of Sec. 2769, R. S. 1909, which was enacted long prior to the date of this contract, all contracts which by the common law are joint only are declared to be joint and several; and by Secs. 1981 and 2772, R. S. 1909, it is provided that in all cases upon joint obligations and joint assumptions of copartners or others, suits may be brought against any one or more of them, and that in all such actions the plaintiff shall not be nonsuited by reason of his failure to prove that all the defendants are parties to the contract, but may have judgment against such of them as he shall prove to be parties thereto. Under the provisions of those sections of the statute, and the numerous decisions of this court construing them, for all practical purposes all contracts which at common law were joint only are now joint and several, and any one or more of the obligees thereto may be sued, and a recovery had against those only who the evidence shows are liable thereon. The decisions so holding are too numerous to be here cited, but many of them are cited in the foot notes to the sections of the statutes before mentioned. In the light of these statutes and the decisions construing them, with the dissenting opinion of VALLIANT, J., calling the court's attention thereto, it is inconceivable

to me what induced the court to hold on the former appeal that because the petition declared upon a joint contract a recovery could not be had against those defendants who the evidence showed were liable thereon. The doctrine announced in that case is clearly erroneous, both upon principle, and authority; and in that particular it is hereby overruled.''

The rule in the last Bagnell case is upon principle inconsistent with the case of Otrich v. Railroad, supra, and the latter should for that reason be, and it is hereby overruled.

As regards the Doster case, supra: We are unable to state whether or not, it should be overruled, for the reason that the opinion may have reached proper conclusions, but there is one thing certain and that is, the language of the court in that case is too broad and is in conflict with the plain letter and spirit of the law applicable to such questions, and should not be followed.

This is the first time the tort clause of Sec. 545, R. S. 1899, the same as Sec. 1734, R. S. 1909, has been presented to this court for determination, but it was once before presented to the Kansas City Court of Appeals in the case of Noble v. Kansas City, 95 Mo. App. 167. That section reads as follows:

''Every person who shall have a cause of action against several persons, including parties to bills of exchange and promissory notes, and who shall be entitled by law to one satisfaction therefor, may bring suit thereon jointly against all or as many of the persons liable as he may think proper; and he may, at his option, join any executor or administrator or other person liable in a representative character, with others originally liable.''

In the Noble case, the court used this language: ''Under this section plaintiff had the right to sue all the persons who were liable for the wrong which she

had suffered, or she might have sued any one of them."

That ruling was unquestionably right for the simple reason that a tort in the very nature of things must be several as to each and all persons, because each must and does act for himself, that is, no one can legally act for another as an agent or otherwise, in the commission of a wrong. The wrong itself being illegal, of course one person cannot legally represent another in doing that wrong. This is self-evident. While it is true all may act together and at the same time, and have a common purpose, nevertheless, each acts for himself or herself; and for that reason there can be no contribution between wrongdoers, each must stand the full penalty of his wrongful act, and cannot compel his co-wrongdoer to contribute to the damage he has been compelled to pay on that account, except where it is otherwise provided for by statute. The practice in this State, and in all other States, in so far as I have been able to learn, has been uniformly in keeping with the rule before announced in the Noble case.

To be sure the point has never been made and that is the reason that it has never been decided by this court. Our reports, however, are full of cases showing where the injured party has at his option sued one or all of the co-tortfeasors, and a recovery had against only one or all of them. The latest case of that character I now recall is that of Clark v. St. Joseph Terminal Railway Company, 242 Mo. 570.

In our opinion there is no substance in this instance.

VI. It is finally insisted by counsel for Montgomery Ward & Company that the "action of the court throughout the trial" was erroneous. If we correctly understand counsel, they contend that the general con-

duct and demeanor of the court throughout the trial betrayed a hostile feeling toward the appellants and conveyed to the jury the idea that the sympathy of the court was with respondent.

If that is true, it was very reprehensible for the reason that the bench and bar know that the jury is ever alert to know what the opinion of the court is, as to the merits of the case, and if they once ascertain that fact common experience teaches us that in many cases they follow the opinion of the court. Not only that, if that opinion of the court is conveyed to the jury by action, facial expression, insinuation or innuendoes without expression or in such manner that it cannot be put into the record, it would be almost impossible to bring such matters before this court for review, and for that reason the trial court should be exceedingly careful about influencing the jury in that manner, otherwise an irreparable injury might be done.

We do not mean by these observations to convey the idea that we are of the opinion that the learned judge who tried this case was guilty of any such conduct, for after carefully reading all counsel for appellant had to say upon this subject, we are unable to see anything in this record which would justify us in finding that the trial court had been guilty of any misconduct in that regard.

VII. This brings us to the consideration of the Richmond Safety Gate Company branch of the case.

The first error assigned by counsel is, that the court erred in refusing the demurrer to the evidence; and the second is, that the court erred in refusing to peremptorily instruct the jury to find for this appellant.

Counsel assign three reasons why the demurrer and the instruction should have been given:

"(a)  There was no evidence of negligence on the part of the defendant, Richmond Safety Gate Company.

"(b)  The deceased was guilty of such negligence as to preclude a recovery as a matter of law.

"(c)  The negligence of the elevator operator, if any, will be imputed to the deceased."

We will consider these assignments in the order stated.

Attending the first: In a former paragraph of this opinion we have fully stated the evidence bearing upon the conduct of both the Richmond Safety Gate and the deceased, at the time and just prior to the time the accident occurred. We held there and we hold here, that the place where the deceased was injured was not necessarily a dangerous one, but only became so by the wanton or careless conduct of those who had control of and operated the elevator; also that he did not assume any risk which arose out of the negligence of the employer. That being true, we could not declare as a matter of law, that deceased was guilty of such negligence as would preclude a recovery.

As to the second assignment: If we should view the evidence in the strongest light possible against respondent, it would only tend to show that the deceased was guilty of contributory negligence (that is, that it was evidence of negligence on his part for having placed his body at a place where he might have apprehended the employees of the appellant might negligently have caused the elevator to descend upon him) and the jury having found upon an abundance of evidence, and under proper instructions from the court, that the deceased was not guilty of contributory negligence, we would not be warranted in holding that the deceased was guilty of negligence as a matter of law. We, therefore, rule this point against the appellant.

As to the third: We are of the opinion that the negligence of the elevator operator was not imputable to the deceased for the reason that there is an abundance of evidence which tends to contradict the contention of the appellant, namely: that deceased was instructed to do his work from the floor of the elevator; that he disregarded that instruction and made arrangements with the elevator operator to warn him of the elevator's approach. Practically all of the evidence upon that subject was the testimony of Pletz and Thompson, the elevator operator and the foreman of this appellant respectively, and their testimony must have weighed but little with the jury because it was contradictory all the way through upon the most important parts. That is, parts of their testimony was to the effect that deceased was instructed to do his work from the floor of the elevator car, and not to kneel or lie upon the floor of the building and protrude his body into the shaft; also that in pursuance to that instruction, on the first trip up the elevator made after Hutchinson began to work on the shaft, the elevator operator, at the request of deceased, stopped the elevator at the fifth floor and let the deceased in, and from the elevator he did certain work. Pletz and Thompson also testified that on the second trip up Pletz complained to Thompson, who was in the car, that Hutchinson was violating his instructions and would not work from the elevator, but persisted in working from the floor of the building and protruding his body into the elevator shaft, and requested Thompson to make Hutchinson quit that manner of doing his work, because he, Pletz, "did not want to hurt anyone."

This evidence could not have been true, for the reason that they testified that on the first trip Hutchinson had the car stopped and did his work from the floor thereof and the evidence is not only uncontradicted, but corroborated by them, that deceased was kill-

ed on the second trip down, which was made within two or three minutes after the first trip was made; so it is plain that he had no opportunity to violate the instructions, or give any to Pletz.

In our opinion, the great weight of the evidence is in favor of respondent, the substance of which we stated in paragraph one of the opinion; and it is unnecessary to prolong this opinion by restating it here.

The fact stands out boldly that the deceased, an employee of this appellant, was working in the elevator shaft where it placed him, and where he had to be in order to do his work, and having undertaken the duty to warn him of approaching danger, the company is liable for negligently failing to do so.

The law is well settled, that when the appellant put the deceased to work in the elevator shaft to drill the holes and put in place and fasten the bolts mentioned in the evidence, it became its duty to prevent the elevator from descending upon him. And the deceased did not assume the risk arising from the appellant's neglect to use suitable precaution for his safety. And it is no answer to say that the place was reasonably safe when the deceased was put to work in the shaft, for the reason that the duty of the appellant was a continuing one, and if the deceased's position was made dangerous by lowering the elevator, then it was the plain duty of the appellant to have given him timely warning of the approaching danger. [Koerner v. St. Louis Car Co., 209 Mo. 141, l. c. 157, and cases cited.]

We are, therefore, of the opinion that the court properly refused the demurrer to the evidence and the peremptory instruction telling the jury to find for this appellant.

VIII. It is next insisted that the respondent is not entitled to a recovery for the reason that there were two ways by which the deceased could have done his work, one dangerous and the other safe, namely:

the first, by standing in the elevator and working from the floor thereof; and second, by kneeling or lying upon the floor of the building and protruding his head and arms into the elevator shaft; and he having taken the second, a dangerous way, the respondent cannot recover.

Counsel for appellant has overlooked the fact that the evidence for the respondent tended to show that there was but one way furnished to the deceased by which to do the work, and that was the second way, before mentioned; and the jury having found that fact in favor of the respondent, the question here presented is necessarily eliminated from the case.

But in passing we might with propriety add, as this court has repeatedly held, that where there are two ways by which the servant may do a particular thing, one dangerous and the other not so hazardous, both, however, furnished by the master, with the intention that the employee may at his discrimination use either, then it does not lie in the mouth of the former to say to the latter that he cannot recover because he chose the more hazardous way.

This insistence is devoid of merit.

IX.    Counsel for appellant Richmond Safety Gate Company complain of the action of the court in giving for respondent instruction numbered one.

This instruction is practically the same as instruction numbered two, given for respondent under the Montgomery Ward & Company branch of the case. The only material difference being that this one applies to the Richmond Safety Gate Company, while that one applies to Montgomery Ward & Company. Substantially, the same objections are made by counsel to this instruction that were made by counsel to that one; and after a careful consideration of all of them we are satisfied that none of them are tenable, for the reasons

stated in paragraph three of the opinion, where we had that instruction under consideration.

X. Counsel for this appellant also complain of the general conduct and demeanor of the court toward them throughout the trial of the cause; no single act in and of itself amounts to much, but all taken together, it is said, show a spirit of unfairness and oppression and consequently were injurious to their cause.

A number of the most tangible incidents along that line which occurred during the progress of the trial, are set forth in the briefs, among which was one that occurred while counsel for appellant was objecting to the impeachment of Pletz, the elevator operator. Upon that occasion, after the court had overruled objections to certain testimony, counsel for respondent continued to ask the same questions, and counsel for appellant, in a respectful manner continued to enter objections thereto. After this had been repeated two or three times the court addressed counsel for appellants as follows:

"The Court: Well, gentlemen, I of course must admonish you that your duty here as counsel is to make fair objections. It is necessary that the foundation shall be laid, and I am going to exclude everything that does not go directly to the exact language, and Mr. Bird has the right to put these questions in varying forms, and you must not object on that ground. It is disrespectful to the court and is a violation of your duty as counsel."

We passed upon the admissibility of this evidence when considering Montgomery Ward & Company's appeal; and there is nothing more we can add to the ruling there made.

However, we are of the opinion, after carefully reading all that occurred during the introduction of this testimony, that the conduct of counsel did not justify this severe castigation at the hands of the court.

Yet, we cannot believe that this conduct of the court was due to any ill feeling toward counsel or litigants or that it materially affected the merits of the case. The record shows that the words were spontaneously spoken, without apparent just provocation, but through thoughtlessness, and could not therefore have been prompted by prejudice or ill will, or through any design to prejudice the mind of the jury against the appellants.

While these observations may not have been justified, yet that fact alone would not justify this court in imputing any evil motive to the honorable judge who tried the case.

Our own experience teaches us that judges are but human, and they, like other people, during the excitement of the trial, worry over the perplexing questions that are presented and on the spur of the moment may in an unguarded moment say things which they did not mean, especially as it appears in black and white, disconnected from its surroundings, and feel sorry for having said them before the echo of the voice is lulled into silence.

Notwithstanding this unfortunate incident, we are clearly of the opinion that it was not such prejudicial error as should warrant this court in reversing the judgment.

We are, therefore, of the opinion that the judgment should be affirmed; and it is so ordered.

All concur.